UNITED STATES of America, Appellee,

v.

William Edward BETHEA, Appellant.

No. 75–1472.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 4, 1976.

Decided April 29, 1976.

Thomas R. Frantz and Frederick T. Stant, Jr., Virginia Beach, Va., for appellant.

Roger T. Williams, First Asst. U. S. Atty., Norfolk, Va., and (William B. Cummings, U. S. Atty., Norfolk, Va., on brief) for appellee.

Before HAYNSWORTH, Chief Judge, and CRAVEN and FIELD, Circuit Judges.

CRAVEN, Circuit Judge:

This is a "net worth" income tax evasion [1] case. More than 20 years ago Mr. Justice Clark, speaking for a unanimous Court, lectured the nation's prosecutors on the dangers of the net-worth method of proof in tax evasion prosecutions.[2] What he then said, in *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), has not been eroded by time. He began by recognizing that the net-worth method involves "something more than the ordinary use of circumstantial evidence in the usual criminal case." *Id.* at 124, 75 S.Ct. at 130. He emphasized that the method is "so fraught with danger for the innocent that the courts must closely scrutinize its use."

*Id.* at 125, 75 S.Ct. at 130. Although concluding that the dangers inherent in the net-worth method were not so great as to outlaw it, he cautioned that they do "require the exercise of great care and restraint," and admonished trial courts to "approach these cases in the full realization that the taxpayer may be ensnared in the system which, though difficult for the prosecution . . . is equally hard for the defendant . . . ." *Id.* at 129, 75 S.Ct. at 132. *Holland* also carried a message to the courts of appeals: that we "should review the cases, bearing constantly in mind the difficulties that arise when circumstantial evidence as to guilt is the chief weapon of a method that is itself only an approximation." *Id.* Having done that, we are convinced that the government failed to establish guilt beyond a reasonable doubt, and reverse.

I.

Bethea filed no income tax return for the years 1971 and 1972 and paid no income tax in either year. In order to convict Bethea under 26 U.S.C. § 7201, the government had to prove that during those years he incurred tax liability [3] and that he took some affirmative act with the intent of thereby evading that tax liability.[4] It undertook to do so by invoking the "net worth" method of proof.

On the net-worth theory, the government must first establish the total net value of the defendant's assets at the beginning of the tax year in question. That figure is subtracted from the net value of his assets at the close of the tax year, and to it is added all his non-deductible expenditures during the year. The final

---

1. The defendant was convicted on two counts of having violated 26 U.S.C. § 7201 which provides:

    Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

2. Mr. Justice Clark was especially well qualified. He spoke to the United States Attorneys as their former boss. Five years previously he had relinquished his job as Attorney General of the United States.

3. *Lawn v. United States*, 355 U.S. 339, 361, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). *See also Sansone v. United States*, 380 U.S. 343, 351, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965).

4. *Spies v. United States*, 317 U.S. 492, 499, 63 S.Ct. 364, 87 L.Ed. 418 (1943).

figure is the defendant's "taxable income" if the government's proof either (1) negates all *non*-taxable sources of income or (2) demonstrates a *likely* taxable source which generated the income. *United States v. Massei*, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958); *Holland, supra.* We conclude that under neither theory did the government introduce sufficient evidence from which the trier of fact could find guilt beyond a reasonable doubt. *See United States v. Fisher*, 484 F.2d 868, 869 (4th Cir. 1973), *cert. denied*, 415 U.S. 924, 94 S.Ct. 1428, 39 L.Ed.2d 480 (1974); *United States v. Sherman*, 421 F.2d 198, 199 (4th Cir.), *cert. denied*, 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970).

## II.

Bethea does not challenge the government's final net-worth figure in either tax year. Instead, he contends that the prosecution failed to negate all non-taxable sources of the net worth increase. Under the facts of this case, that claim is equivalent to the contention, which Bethea also makes, that the government failed to establish "with reasonable certainty" his opening net worth.[5]

Bethea testified at trial that the increases in his worth established by the government were derived from an inheritance of between $53,000 and $54,000 which was left him by his brother, Vernon Bethea, who was knifed to death in July 1970 in New York City. Vernon Bethea had been a narcotics dealer[6] who made frequent trips to Norfolk, Virginia. According to the defendant, his brother often left with him sealed envelopes containing money to be put in his safe deposit box and told him the contents of those envelopes were his if Vernon were to die. Bethea swore that he never opened them until approximately a month after his brother's death.[7] He said he found between $53,000 and $54,000, but because of his uncertainty as to the legal status of the money, he did not begin to spend it in appreciable amounts until October 1971. He soon learned, however, and by May 9, 1973, when the box was inventoried by internal revenue agents, it contained only $1,062; the rest, according to Bethea, having been spent.

The government responds that Bethea's statements are simply the typical unverified and unverifiable "cash hoard" defense raised frequently in net worth tax evasion cases.[8] Furthermore, it strongly emphasizes that when asked by revenue agents early in the investigative process concerning any "inheritances," Bethea mentioned only $2,000–$3,000 which he recovered from a box in his brother's New York City apartment.[9]

The court found "the defendant's assertions to be inherently incredible, and not worthy of belief." We think Judge MacKenzie meant that Bethea's story was inherently stranger than fiction, and in that sense "unbelievable." We find no clear rejection of Bethea as one unworthy of belief, *i. e.*, a judgment resting upon observation of demeanor, manner, voice tones, etc., and a judgment peculiarly within the province of the trial judge.[10]

---

5. *Holland, supra*, 348 U.S. at 132, 75 S.Ct. 127.

6. That Vernon Bethea's extensive police record [some five pages long] contained eight counts of sale of heroin strongly supports that inference.

7. Bethea testified that he never opened the envelopes "[b]ecause I didn't want no [sic] misunderstanding with him. He would know if I had opened them." Transcript at 185.

8. *See, e. g., Smith v. United States*, 236 F.2d 260 (8th Cir.), *cert. denied*, 352 U.S. 909, 77 S.Ct. 148, 1 L.Ed.2d 118 (1956) (money hidden in an old mail bag or buried in an iron pot); *Mighell v. United States*, 233 F.2d 731 (10th

Cir.), *cert. denied*, 352 U.S. 832, 77 S.Ct. 47, 1 L.Ed.2d 52 (1956) (a buried cash hoard).

9. At trial, Bethea testified that this $3,000 which he personally went to New York to recover, was in addition to the money in the safe deposit box.

10. A finding of fact in a criminal case may certainly be set aside by a federal court of appeals if found to be clearly erroneous (*See United States v. Glover*, 514 F.2d 390, 391 (9th Cir. 1975), *cert. denied*, 423 U.S. 857, 96 S.Ct. 108, 46 L.Ed.2d 83) and might even be set aside upon a lesser showing given the higher burden of proof on the government in criminal prose-

The objective facts make Bethea's story not so incredible. The government concedes, indeed insists, that Bethea at the end of 1970 was a poor man. For the tax years 1967 through 1970, his adjusted gross income averaged approximately $2,850,[11] according to government figures. He lived in what was described as a cold-water flat, with a rent of from $10 to $11 per week. He made purchases on credit with extended payment periods.

After his brother's death Bethea's life style changed dramatically. In October 1971, he moved into a new apartment with rent of $180 per month—some four times more expensive than his old apartment. He purchased a new Buick, paying more than $4,000 in cash, and he placed approximately $2,000 in a savings account. All told during that year, his net worth increased $7,419.21. And in 1972 it increased by $15,741.06, which amounted to better than a 100 percent increase.

It is an undisputed fact that at a time when Bethea was living in poverty conditions, he rented a safety deposit box at a bank. What would a poor man want one for and what would he keep in it? Why would he visit that box 18 times between June 1969, when he acquired it, and July 13, 1970, the date of his brother's death? The government's evidence of his poverty lifestyle during that period strongly supports Bethea's testimony that he visited the box to put envelopes containing his brother's money in it, and not to take money out of it. That Bethea's brother Vernon had a lot of money is corroborated in the record by the testimony of Thomas W. Moss, attorney at law, who saw Vernon Bethea exhibit a large envelope containing $100 bills. He testified that Vernon Bethea said the envelope contained $7,500 and that he could get that much more with little or no effort.

The typical "cash hoard" defense which the government disparages rests upon the totally uncorroborated testimony of a defendant that years ago he buried money in his backyard. Bethea's story is atypical. He says his brother made a lot of money in the narcotic traffic in New York. Vernon's criminal record confirms that he was in the business. Lawyer Moss' testimony confirms that Vernon at times carried very large sums on his person. And finally the bank's records show the rental of a safety deposit box by a defendant living at a poverty level. The government, in short, offers no evidence to refute the probability of a cash hoard, and instead, relies solely upon a natural disinclination to believe that large sums of money are ever cached away.

It is not necessary that we believe Bethea's story to reverse his conviction. He is not required, even under the net-worth theory, to prove his innocence; the government must establish his guilt beyond a reasonable doubt.

cutions. (*Cf. Jones v. Pitt County Bd. of Education*, 528 F.2d 414 (4th Cir. 1975) (Craven, J. dissenting)).

11. Bethea's adjusted gross income according to government figures for the four years is as follows: 1967—$2,068.19; 1968—$1,551.17; 1969—$6,500.64; and 1970—$1,305.26. Transcript at 154.

Above we have presented his income as an average for those four years because we believe it more accurately reflects the evidence as to Bethea's accretion of wealth. We find that the figure of $6,500.64 for 1969, while eminently fair as to the critical issue of net worth increase during 1971 and 1972, artificially lumps income in that year. A key element of that figure is $3,000 cash on hand which Bethea testified was in addition to the $3,000 obtained from his brother's apartment and which he told the revenue agents he accumulat-ed between 1969 and 1972. By placing that amount in the earliest tax year, 1969, the government reduced Bethea's income during the indictment period but increased it in 1969. From Bethea's testimony, which is the only source of this figure (*see* Transcript at 118 & 135), we have no way to determine when the money was accumulated. Similarly, the 1969 income includes a $1,023.90 non-deductible loss which Bethea realized when he traded for a newer automobile and received less than the original purchase price as a trade-in. We do not believe that this increase is properly viewed as occurring in only 1969 when the issue at hand is the real availability of income to Bethea in that year. Again, the government's treatment of this issue did not prejudice Bethea as to the critical period of 1971–72, but it does have the effect of making the 1969 income appear artificially large.

But it is urged upon us that even if we should view the evidence as a failure on the part of the government to satisfactorily negate all non-taxable sources of increase in net worth, the conviction may nevertheless be sustained on the ground that the evidence shows a likely source of taxable income. We agree that the net worth evidence rules provide the prosecutor with a two-edged sword and that he may cut either way. If he cannot negate all non-taxable sources, he can prove the substantial equivalent by demonstrating a "likely source" of taxable income. *Holland, supra, as interpreted in Massei, supra.*

On this point the district court found: The evidence clearly showed beyond all reasonable doubt that the defendant, in the years in question, had a source of income as a carpenter. He, himself, estimated his income from that source on credit applications signed by him during the years in question as $250 per week.

For reasons that subsequently appear, we view this finding as clearly erroneous.

■ Except for the statement on a credit application that his income was $250 per week, which was highly self-serving at the time made and not then either under oath or subject to cross-examination, *all* the evidence showed that Bethea normally made only $200–$300 per *month* when working for his uncle, Wilson Hill, and acquired small amounts of additional income (approximately $20 per job) working independently. During the tax years 1971 and 1972 his income from carpentry was, according to uncontroverted testimony, even smaller because of the significant amounts of time he spent in 1971 repairing his grandmother's house and in 1972 building houses for himself and his mother.

Most importantly, there is nothing in the record to indicate that Bethea's carpentry income went up at all during the years 1971 and 1972 when his net worth sharply increased. The government's own accounting showed that Bethea averaged only $2,856.31 during the four tax years 1967 through 1970 from his employment. Finally, we think it

fair to comment that the government seemed at one point during the trial to urge that Bethea's source of income was illicit rather than derived from his carpentry business. Bethea's cross-examination by Roger Williams, Assistant United States Attorney, disclosed the government's theory:

[Williams] As a matter of fact, Mr. Bethea, weren't you and your brother in partnership?

[Bethea] What do you mean, partnership?

[Williams] In the narcotics business?

[Bethea] No sir, I don't deal in narcotics.

[Williams] Mr. Bethea, didn't you take over your brother's narcotics business?

[Bethea] No, sir.

[Williams] Wasn't this where you got all the money to put in the house?

[Bethea] No, sir.

Transcript at 226.

There are two problems with this suggested source of income. First, not one shred of evidence was introduced at trial to show that Bethea had any dealings in narcotics or was in partnership with his brother. Second, the timing of any narcotics activity was not shown or even suggested. Such timing would be critical to the government's proof under the present indictment. If Bethea was in partnership with his brother, presumably the profits would have been realized before his brother's death in the summer of 1970 and would therefore have been a source of net worth at the beginning of the period of the indictment and would have gone to exculpate him. On the other hand, if Bethea "took over" his brother's business, then the revenues may have been realized during 1971 and 1972, but there is absolutely no proof either as to Bethea's participation in criminal enterprise or the timing of any participation. We cannot sustain this conviction upon mere speculation that Bethea might have made a lot of money unlawfully. The short answer is there is *no* evidence of substantial earned income—either lawful or unlawful that can account for the increases in net worth.

### III.

■ The government emphasizes that when Bethea was interviewed by Special Agent Jerry Rowe on May 8, 1973, and was asked whether he had received any gifts or inheritances during the period 1968 through 1972 he said that he received only $2,000–$3,000 from a box in his brother's apartment. It is urged that the trier of fact was entitled to credit Bethea's declaration and thus reject his cash hoard testimony. As for the declaration to Agent Rowe, the district judge was in no better position to judge credibility than are we: he did not hear or see him speak.

Bethea explained his failure to disclose the larger inheritance to be a result of his ignorance of the tax consequences of inherited wealth and his fear that "they would try to take it away from [him]. . . . ." Transcript at 202.

■ It is not an irrational apprehension. Aside from moral sensibility, we think some bankers, perhaps even a few lawyers, might feel uncomfortable in possession of a very large sum of tainted money. Bethea attended school for only a five-year period, and we cannot impute to him knowledge of the common law of trover. Not everyone knows that the innocent possessor of illicitly gained money has a sufficient property interest to retain it against all the world except the true owner. *Armory v. Delamire*, 93 Eng.Rep. 664 (K.B. 1722).

■ That Bethea's testimony may be interpreted as an admission that he initially lied to the agent because he feared income tax liability is insufficient to establish guilt under 26 U.S.C. § 7201. Willful intent is irrelevant unless a tax deficiency is established. *Lawn v. United States*, 355 U.S. 339, 361, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). *See also Sansone v. United States*, 380 U.S. 343, 351, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965).

Because of failure to offer evidence sufficient to establish Bethea's guilt beyond a reasonable doubt, the conviction will be

*REVERSED.*