**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Johnson C.S. CHU, Defendant-Appellant.**

No. 84–2623.

United States Court of Appeals, Seventh Circuit.

Argued April 24, 1985.

Decided Dec. 9, 1985.

Charles A. Asher, South Bend, Ind., for appellant.

Jerome Frese, Asst. U.S. Atty. (R. Lawrence Steele, Jr., U.S. Atty.), South Bend, Ind., for appellee.

Before COFFEY, FLAUM, Circuit Judges, and GIBSON, Senior Circuit Judge.*

COFFEY, Circuit Judge.

The defendant, Johnson C.S. Chu, appeals his convictions on two counts of income tax evasion for the years 1977 and 1978 in violation of 26 U.S.C. § 7201. We affirm.

---

* The Honorable Floyd R. Gibson, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

## I.

Dr. Johnson C.S. Chu, M.D. ("Chu") and Dr. Sylvia Cheng Chu, M.D. ("Cheng"), his wife, immigrated to the United States from mainland China in 1948. Following their arrival, Chu and Cheng both engaged in the practice of medicine, doing psychiatric work in state hospitals, initially in West Virginia, and since 1956, at Logansport State Hospital in Logansport, Indiana. In addition to their psychiatric practice at the state hospitals, Chu and Cheng also engaged in the general practice of medicine at their own clinic, the Southeastern Medical Center in Walton, Indiana. In September 1978, agents from the Drug Enforcement Administration (DEA) obtained a search warrant and searched a cottage on the Logansport State Hospital grounds used by Chu and Cheng, "looking for records related to distribution and receipt of controlled substances." As a result of the search, DEA Compliance Inspector Joel Fries discovered $21,873 in cash found in three sealed envelopes in a safe on the premises and seized the envelopes and cash along with records of controlled substance purchases. In September or October 1978, the DEA informed the Internal Revenue Service (IRS) of the seizure of the currency. The IRS believed the information received from the DEA warranted a criminal investigation and initially assigned agent James P. Hinkle to investigate Drs. Chu and Cheng. Before commencing his investigation, Hinkle ascertained whether the DEA was intending to seek an indictment of the Doctors on the controlled substance charges pursuant to a Department of Justice policy to avoid "dual prosecution" of individuals. In early 1979 a federal grand jury in the Northern District of Indiana indicted Chu and Cheng on five counts of improper distribution of controlled substances and improper record keeping in violation of 21 U.S.C. §§ 841(a)(1), 843(a)(4) and 18 U.S.C. § 2. In July 1979, the United States District Court for the Northern District of Indiana dismissed without prejudice all counts of the indictment against Chu and Cheng as being "vague and ambiguous [and suffering] from duplicity."

Shortly thereafter, DEA Inspector Fries informed Agent Hinkle of the IRS that "the charges had been dropped."

Hinkle activitated the IRS investigation of Chu and Cheng, telephoned Chu, and arranged to meet Chu and his wife at the Southeastern Medical Center in Walton, Indiana, on September 12, 1979. On that date Agent Hinkle and IRS Agent Stephen Platt met with Chu and Cheng. Hinkle identified himself as "a Special Agent for the [IRS] assigned to the Criminal Investigation Division," and informed Chu and Cheng that he "had been assigned the investigation of their federal tax liability." Before asking any questions, Hinkle recited the following statement from a card given by the IRS to its agents:

"As a Special Agent one of my functions is to investigate the possibility of criminal violations of the Internal Revenue laws and related offenses. In connection with my investigation of tax liability I would like to ask you some questions. However, first I advise you that under the Fifth Amendment to the Constitution of the United States I cannot compel you to answer any questions or to submit any information if such answers or information might tend to incriminate you in any manner. I also advise you anything which you say and any documents you submit may be used against you in any criminal proceeding which may be undertaken. I advise you further that you may, if you wish, seek the assistance of an attorney before responding."

Hinkle then asked Chu and Cheng individually if they understood their rights; both answered, "Yes." Hinkle then asked each of them individually whether they wished to continue the interview, and after Chu and Cheng discussed among themselves in Hinkle's presence the advisability of obtaining a lawyer, they told Hinkle they wished to continue with the interview without the presence of a lawyer.

Hinkle began questioning Chu and Cheng about their financial affairs. The defendants advised Hinkle that none of the loans they previously made to friends or

relatives were currently outstanding, that they had not borrowed any money against life insurance policies, that they had not borrowed any money from individuals, and that any loans they received were reflected on their tax returns. The defendants discussed their purchases of stocks and bonds, gave Hinkle the name of their stockbroker in Indianapolis, and disclosed their real estate purchases, including the location and purchase price. Hinkle then asked the defendants about their "cash on hand", explaining that by that term he meant "currency and coins which they had on their person or at any other location or being held by anyone for them.... I expressly told them I was not referring to bank accounts." The defendants told Hinkle that "they had never had a practice of accumulating large sums of currency except for some money which had been obtained from them by the [DEA]." According to the defendants, the $21,000 seized by the DEA "represented money which they had received from loans and also from the sale of a house in China." Chu estimated that the most cash he had on hand at the end of the years 1975 through 1978 was between $150 and $200, and Cheng estimated that she had between $200 and $300 cash on hand at the end of the same four years.

On at least eight subsequent occasions through August 1980, Agent Hinkle, and later IRS Agent William Schroer, the agent to whom the investigation was later reassigned, met with the defendants and discussed their financial affairs. The agents examined and inventoried the contents of the defendants' safety deposit boxes, microfilmed documents, made a list of the defendants' savings bonds, collected records regarding the patients' accounts at the Southeastern Medical Center, and obtained their bank records.

The defendants eventually retained counsel, and on July 29, 1982 the defendants' attorneys provided Agents Hinkle and

Schroer with letters written in Chinese, dated in 1979, 1980 and 1981, allegedly referring to the existence of loan transactions between the defendants and other family members. Agent Hinkle requested that the defendants provide the originals of the letters in order that a lab analysis might be conducted to determine the authenticity of the letters. The originals were never delivered. The IRS translated the copies of the letters, and inquired of the State Department whether any information in the letters could be investigated in mainland China. Agent Hinkle testified that after his superiors contacted the State Department, they informed him that the leads in the letters could not be investigated in mainland China and further that the IRS was unable to obtain any other pertinent information on the leads. The government requested production of the original letters, as well as any documentation the defendants might have in support of their purported family loan transactions. Neither the original letters nor any documentation has been produced.

After the thorough investigation of Agents Hinkle and Schroer, Chu and Cheng were indicted and tried in the Northern District of Indiana on two counts of evading federal income taxes in violation of 26 U.S.C. § 7201.[1] At the conclusion of the defendants' joint trial, the jury returned guilty verdicts against each of the defendants on both counts. The court sentenced each of the defendants to two years of imprisonment, suspended their sentences, placed each one of them on probation, and fined them $20,000 individually. The defendants appealed. On appeal, Chu[2] contends: 1) that the evidence was insufficient to prove him guilty of willful tax evasion; 2) that the trial court erred in admitting certain statements made by the defendants to IRS agents; and 3) that he was denied a fair trial by the suggestion in the government's closing argument that the defend-

---

**1.** The evidence introduced at trial revealed that Chu and Cheng evaded $11,141 in federal income tax for tax year 1977 and $29,933 for tax year 1978.

**2.** After the filing of this appeal defendant Dr. Sylvia Cheng Chu, M.D., died, and the district court set aside and deemed abated defendant Cheng's convictions.

ants engaged in uncharged criminal conduct.

## II.

■ In reviewing Chu's claims regarding the sufficiency of the evidence supporting his conviction, we must determine "whether, after reviewing the evidence in the light most favorable to the government, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original); *United States v. Welsh,* 721 F.2d 1142, 1145 (7th Cir.1983); *United States v. Moya,* 721 F.2d 606, 610 (7th Cir.1983), *cert. denied,* 104 S.Ct. 1312 (1984). In the case before us, the government prosecuted the defendants employing the net worth method of proving willful tax evasion.

"In a typical net worth prosecution, the Government, having concluded that the taxpayer's records are inadequate as a basis for determining income tax liability, attempts to establish an 'opening net worth' or total net value of the taxpayer's assets at the beginning of a given year. It then proves increases in the taxpayer's net worth for each succeeding year during the period under examination and calculates the difference between the adjusted net values of the taxpayer's assets at the beginning and end of each of the years involved. The taxpayer's nondeductible expenditures, including living expenses, are added to these increases, and if the resulting figure for any year is substantially greater than the taxable income reported by the taxpayer for that year, the government claims the excess represents unreported taxable income."

*Holland v. United States,* 348 U.S. 121, 125 (1954).

### A. Opening Net Worth

■ "[A]n essential condition in cases of this type is the establishment, with reason-

able certainty, of an opening net worth, to serve as a starting point from which to calculate future increases in the taxpayer's assets." *Holland,* 348 U.S. at 132. Chu asserts that the government "totally failed to prove a reasonably certain opening net worth" in two respects. Initially, Chu states that there was no evidence introduced to establish that the assets listed in the government's summary for December 31, 1976 were a complete listing of all of the defendants' assets. According to Chu, the only evidence regarding opening net worth presented by the government was the testimony of the government's summary witness, IRS Agent Robin Zeldin.[3] Chu contends that Zeldin's testimony revealed that the government's opening net worth statement did not include all of the assets in their (defendants') possession on December 31, 1976:

"Q. Now, Mr. Zeldin, you have a figure for Series E savings bonds listed here on your assets computation. Isn't it, in fact, true there are more Series E savings bonds than you listed here? ... Isn't true that they had considerably more savings bonds than [$43,875]?

A. Based upon what is in evidence that is the amount that they have [sic].

Q. Yes, but don't you for a fact show they had more savings bonds than that?

A. There are indications that they have [sic]."

On the basis of this testimony, Chu suggests the government has failed in its burden of establishing the taxpayer's opening net worth.

Chu relies on *Merritt v. United States,* 327 F.2d 820 (5th Cir.1964), where the court held that "the failure to include in the opening net worth all assets known by the government to have been held by the taxpayer during the period in question was error." *Id.* at 823. In *Merritt,* the govern-

---

**3.** Robin Zeldin analyzed the defendants' net worth for the tax years 1977 and 1978 based on the exhibits received into evidence and the testimony offered at trial. Zeldin prepared charts which summarized the evidence and his analysis of the defendants' financial affairs for 1977 and 1978.

ment's summary witness testified as follows:

"Q. ... As a matter of fact don't you know that as a matter of fact this taxpayer owned assets and had assets that you didn't even take into account in this case? ...

A. He has some other assets, yes, sir.

Q. And this doesn't include all those assets does it?

A. No sir.... I know there are other assets of the taxpayer."

327 F.2d at 821. In addition, the taxpayer in *Merritt* testified and confirmed the agent's testimony regarding the existence of other assets. 327 F.2d at 823. In the case at bar, the summary witness, Robin Zeldin, testified that "there are *indications* that they have [more savings bonds]." Thus, Zeldin, unlike the summary witness in *Merritt*, was not certain of the fact that the defendants had additional assets which were not included in the government's summary. The record fails to disclose any evidence as to what the "indications" of other assets were. The defendants did introduce evidence of certain stock splits, which had the effect of increasing their opening net worth, and the government's summary witness considered the additional $759 from the stock splits and revised and increased the amount of the defendants' opening net worth. From our examination of the record, we have been unable to discover any evidence to substantiate the defendants' inference that they possessed any additional savings bonds that were not included in the government's summary of assets. In contrast with *Merritt*, where there was clear corroborative evidence of additional assets not included in the defendant's opening net worth, in the case at bar the record contains only unsubstantiated inferences of additional assets.

■ Second, Chu argues that the government failed to establish the defendants' opening cash on hand with reasonable certainty. According to Chu, the government failed to advise the defendants of the net worth prosecution, and thus the defendants did not have notice of the need to disclose a full itemization of their assets. Further, Chu argues that the government knew of the defendants' tendency to keep cash on hand because of the $21,000 seized from the cottage at the Logansport State Hospital and the government was well aware of the fact that Chu's statement that he never had a practice of keeping "much cash on hand" except at the time of the DEA seizure was inaccurate. Chu submits that the government accepted the defendants' low estimate of cash on hand without corroborating the amount of cash on hand on December 31, 1976, and without clarifying the taxpayers' confusion regarding the term "cash on hand." With respect to his "confusion", Chu makes much of the fact that he is an immigrant, "speaking a language wholly unrelated to English," and consequently did not understand the term "cash on hand." The government convincingly established to the contrary that "cash on hand" was adequately explained to Chu, that he understood the term, and that the government did not rely only on Chu's own statements, but also established the defendants' habit of putting money to work rather than allowing cash to sit idle without earning interest.

"Cash on hand in a net worth calculation is only one of several and varied financial assets and is of no greater significance, aside from its liquidity, than other assets." *United States v. Goldstein*, 685 F.2d 179, 181 (7th Cir.1982). "While the source and existence of cash-on-hand need not be proved with mathematical exactitude, the amount must be established with reasonable certainty." *United States v. Terrell*, 754 F.2d 1139, 1146 (5th Cir.), *cert. denied*, 105 S.Ct. 3505 (1985).

In the case at bar, Agent Hinkle testified:

"I explained to them by [cash on hand] I meant currency and coins they had on their person or at any other location or being held by anyone for them. And I expressly told them I was not referring to bank accounts. [The defendants] then told me they never had a practice of accumulating large sums of currency ex-

cept for some money which had been obtained from them by the [DEA]. Mr. Chu estimated that the most cash on hand that he would have had at the end of the years 1975, 1976, 1977, 1978 was between $150 and $200. [Cheng] said the maximum amount that she would have had ... at the end of the same four years was between $200 and $300."

Agent Hinkle, while reading from his investigative reports, recited his perception of the defendants' answers to his questions regarding "cash on hand":

"Mr. Chu stated that his amount of cash on hand never substantially changed and that he never accumulated any large amount.... Mrs. Chu stated that her amount of cash on hand never substantially changed and that she never accumulated any large amount except for the money seized by the [DEA].... Mr. Chu stated that they have a safety deposit box at the National Bank in Logansport. Mrs. Chu stated that only stocks, deeds, and other documents have been kept in that safety deposit box. Both Mr. and Mrs. Chu stated that currency had never been kept in that safety deposit box.... Both Mr. and Mrs. Chu stated that during the year 1975–1978 currency was not kept any place other than on his/her person."

The testimony at trial further revealed that Chu and Cheng had been practicing medicine in the United States since 1948, some thirty years at the time of the IRS investigation, and their medical practice demanded that they be able to consult, confer with, and understand their patients, in particular those patients who had mental or emotional problems. The defendants' son testified that English was the primary language spoken in their home and Agent Hinkle testified that the defendants conversed with him in English and failed to express any difficulty in understanding his questions and their replies to his questions gave no indication of any problem. The defendants' presence in the United States for thirty years at the time of the investigation, the requirement of their medical practice that they be able to understand and com-

municate effectively with their patients, the use of English in their home, and their conversations with Agent Hinkle in English demonstrate that the defendants could clearly understand and communicate in the English language. In addition, Chu and Cheng had significant investments in stocks and bonds, jewelry, foreign investments, real estate, and in a medical partnership. The extent and variety of the defendants' investments combined with their obvious understanding of the English language suggests that the defendants had more than sufficient knowledge of both the English language as well as of financial affairs so that they would not be confused by the term "cash on hand." The defendants failed to offer any evidence other than their own self-serving argument that they had any difficulty conversing in or understanding the same English language they had used for some 30 years. Thus, the record displays ample evidence in support of the conclusion that when Hinkle asked the defendants how much "cash on hand" they possessed, they knew precisely what Hinkle was referring to.

*United States v. Meriwether,* 440 F.2d 753 (5th Cir.1971), *cert. denied,* 417 U.S. 948 (1974), which Chu cites for the proposition that the defendants' admission concerning cash on hand must be corroborated with independent evidence, is contradicted by two later cases also from the Fifth Circuit. For example, in *United States v. Normile,* 587 F.2d 784 (5th Cir.1979), the court stated:

"With respect to cash on hand in currency the government had no way of determining this save by interrogating the taxpayer. He freely and voluntarily told Agent Black that he kept no more than $100 in cash because he did not feel safe having larger amounts around. It was not necessary for the government to seek to corroborate the taxpayer's statement; indeed the inherent secrecy of the cash horde makes it impossible for any but the keeper to know even of its existence, let alone the amount."

*Id.* at 786. In *United States v. Terrell,* 754 F.2d 1139 (5th Cir.1985), the court reaffirmed *Normile,* stating, "The corroboration requirement does not necessarily extend to admissions relating to cash on hand." *Id.* at 1147.

In spite of the fact that the government was not required to corroborate with independent evidence the defendants' admission regarding the amount of cash on hand during the given period, it established the same with a presentation of evidence of the defendants' investment program. The record reflects that the defendants were very knowledgeable in the field of investments, with Agent Schroer testifying that the defendants had a pattern of investing in banks, stocks and bonds, jewelry, real estate, and a medical partnership, convincingly establishing that the defendants knew when, where, and how to invest to their own benefit rather than allow cash to sit idle. *See United States v. Scott,* 660 F.2d 1145, 1160 (7th Cir.1981), *cert. denied,* 455 U.S. 907 (1982) (From the evidence of the defendant's pattern of investing, the court concluded, "it is obvious that Scott seldom let such funds remain idle, without earning any interest."). The defendants acknowledged the one known accumulation of cash, the $21,000 seized by the DEA, and explained it as being money received from a loan and the sale of a house in mainland China. Testimony revealed that the reason the defendants were still in possession of the cash was that Chu and Cheng could not agree on what to do with the cash: Chu wanted to apply the $21,000 to reduce their outstanding mortgage, while Cheng wanted to invest in gold. Other than this $21,000, the record is silent of any evidence of any significant cash on hand on December 31, 1976 or at any time during 1977 or 1978 that was not included in the government's opening net worth calculation. Thus, the defendants' statements that they had a maximum of $500.00 cash on hand on December 31, 1976 and that they "never had a practice of accumulating large sums of currency," except for the $21,000.00 seized by the DEA, together with the evidence of the defendants' pattern of investing available money, when viewed in a light most favorable to the government, provides sufficient evidence for a reasonable trier of fact to conclude that the government did establish the defendants' opening "cash on hand" with reasonable certainty.

### B. Failure To Investigate Leads Provided By The Taxpayer

Chu next argues that the government failed to investigate or follow up leads provided by the defendants which might have led to non-taxable sources of income, and this failure of the government to investigate the leads renders the government's case insufficient to go to the jury under the decisions of *Holland, supra, Scott, supra,* and *United States v. Keller,* 523 F.2d 1009 (9th Cir.1975). Chu focuses on the government's failure to investigate suggestions that members of the defendants' extended family, including relatives residing in mainland China, allegedly loaned and entrusted the defendants with significant sums of money to "buy a house and create a safe sanctuary for members of the extended family." The government contends that the trial court properly instructed the jury that "they have to find from the evidence that the government had met its burden of investigating any lead or explanation supplied by the taxpayer and that *Holland* only requires the government to investigate leads 'reasonably susceptible of being checked.'" The government contends that it investigated every lead reasonably susceptible of being checked brought to its attention. Further, the government notes that during the trial it revised the defendants' opening net worth figures upward to take into account non-taxable sources of income supplied by the taxpayers.

In *Holland,* the United States Supreme Court stated that "When the government fails to show an investigation into the validity of such leads, the trial judge may consider them as true and the government's case insufficient to go to the jury." 348 U.S. at 136. But the *Holland* court also

stated that the government need not investigate *all* leads. The court in *Holland* limited the scope of the government's required investigation to "relevant leads furnished by the taxpayer—leads reasonably susceptible of being checked, which, if true, would establish the taxpayer's innocence." *Id.* at 135–36. Thus, the issue is not whether the government fully investigated each and every lead furnished by the defendants, but whether the government failed to investigate any "relevant leads ... reasonably susceptible of being checked." Agent William Schroer testified that the government investigated all leads concerning certain bank accounts and other records of the defendants and where appropriate, increased its net worth calculation in favor of the defendants. Our attention, then, focuses on whether the government adequately investigated the proffered leads suggesting that additional non-taxable income may have been realized from certain loan transactions within the defendants' extended family.

In 1982, the defendants provided the government with letters written in Chinese dated in 1979, 1980 and 1981, allegedly from family members in China, and allegedly discussing loans given to the defendants in previous years. Agent Hinkle testified that he had the letters translated, requesting the originals of the letters to have a lab verify their authenticity and also requested supporting documentation for the purported loans. The defendants have failed to provide either the original letters much less any supporting documentation for the purported loans. In *United States v. Goldstein*, 685 F.2d 179 (7th Cir.1982), the defendant in a net worth tax prosecution argued that his increase in net worth was attributable to a non-taxable cash inheritance that he received. In holding that the evidence was sufficient to support the jury's guilty verdict, this court stated, "There was not a probated will or other record of any inheritance, and the testimony of the inheritance came from [the defendant's] relatives. The jury was under no duty to accord face value to this self-serving, undocumented testimony." *Id.* at

182. Similarly in the present case, there is no documentation or record of any loans to the defendants other than the copies of alleged letters from the defendants' relatives, and the jury was under no duty to accord face value to the defendants' self-serving claim of having received loans from family members.

Furthermore, Agent Schroer testified that if the alleged family loans that Chu contends were received before January 1, 1977 (the first tax year under examination) were invested prior to January 1, 1977 and were reflected as assets in the defendants' opening net worth statement, the existence of the loans would have no bearing on the defendants' net worth computation. According to Schroer, the existence of the family loans would benefit the defendants' net worth computation only if the alleged loans were held as cash on January 1, 1977 and were converted into assets during 1977 and 1978. Since, as noted above, the record discloses that the defendants engaged in a pattern of investing available funds and the record is silent of any evidence of any significant cash on hand on December 31, 1976 not included in the government's calculation of the defendants' opening net worth, the jury had ample evidence to conclude tht if the defendants in fact received loans from various family members, the funds were invested prior to January 1, 1977 and thus had no bearing on the defendants' net worth during 1977 and 1978.

The diligence of the government in investigating all of the leads which were reasonably verifiable, the lack of the defendants' cooperation in failing to provide originals of letters, the defendants' failure to provide any loan documentation combined with Agent Schroer's testimony that the defendants' net worth would not be affected by any loans invested prior to January 1, 1977 provides sufficient evidence from which a reasonable person would conclude that the government investigated "all leads reasonably susceptible of being checked, which, if true, would establish the taxpayer's inno-

cence." Chu's argument that the IRS should follow leads to mainland China is as ridiculous as suggesting that the IRS must follow like leads into the Soviet Union, Poland, Afghanistan, Iran, Iraq, Africa, or other similar, troubled, and/or distant countries. A lead that requires world-wide investigation to be verified can hardly be characterized as "reasonably susceptible of being checked."

### C. Likely Source of Unreported Income

Chu contends that the government not only failed to establish a reasonably certain opening net worth and failed to negate all possible sources of non-taxable income, but also failed to provide a likely source for additional unreported income. Chu believes the government failed in this regard because: 1) the government offered no evidence of the number of Phendimetrazine[4] actually dispensed rather than stolen, not included in records, or discarded due to damage; 2) the government offered no evidence showing the percentage of Phendimetrazine dispensed for money as opposed to dispensed without charge; and 3) even if each of the 700,000 allegedly missing Phendimetrazine had been dispensed at $.07 a piece, the total income of $49,000 was more than accounted for in the earnings reported by the Southeastern Medical Center for the two years in question.

In a net worth tax prosecution, the government must establish "[e]ither a 'likely source' of the illegally unreported income represented by the calculated increase in net worth plus non-deductible expenditures in the year in question ... or all possible sources of non-taxable income must be negated." *United States v. Grasso*, 629 F.2d 805, 808 (2nd Cir.1980). *See also United States v. Massei*, 355 U.S. 595, 595 (1958). "The government could win its case without even introducing evidence of a likely source of income.... Proving a likely source of income is merely one of the ways that the Government can prove that

the increased net worth resulted from taxable sources." *United States v. Goldstein*, 685 F.2d 179, 183 (7th Cir.1982). Thus, contrary to Chu's contention, the government need not *both* prove a likely source and negate all possible sources of non-taxable income. In the present case, the government presented evidence from which a reasonable jury could find that the government had established "a reasonably certain" opening net worth and that the government investigated all "relevant leads ... reasonably susceptible of being checked," thus negating possible sources of non-taxable income.

*In addition* to negating sources of non-taxable income, DEA Compliance Inspector Joel Fries testified that his review of the defendants' dispensing records of controlled substances, their account book and their purchases of Phendimetrazine revealed a total of over 698,000 Phendimetrazine units unaccounted for during the years 1977 and 1978, and the defense introduced testimony that the Phendimetrazine tablets were generally dispensed at a cost of $.07 per unit. Thus, the record contained sufficient evidence to allow a reasonable juror to conclude that unrecorded sales of the Phendimetrazine constituted a likely source of unreported taxable income. Chu relies on *United States v. Grasso*, supra, and *United States v. Bethea*, 537 F.2d 1187 (4th Cir.1976), both of which are clearly distinguishable from the present case. In *Grasso*, the government investigation yielded "no factual basis for identifying a 'likely source'", 629 F.2d at 808, and in *Bethea* "not one shred of evidence was introduced at trial to show [the defendant] had any dealings in narcotics or was in partnership with his brother [who dealt in narcotics]." 537 F.2d at 1191. In contrast, the jury in the instant case had sufficient evidence before it to conclude that the government negated all possible sources of nontaxable income and also established that unrecorded sales of the unaccounted-for Phendime-

---

**4.** Phendimetrazine is included on Schedule III of the federal government's list of controlled substances. 21 C.F.R. § 1308.13 (1985).

trazine provided a likely source of unreported taxable income.

### III.

We turn now to Chu's contention that the trial court erred in admitting the statements made by the defendants to IRS agents into evidence as the agents contacted and interviewed the defendants without the presence of their counsel in violation of *Massiah v. United States*, 377 U.S. 201 (1964), requiring that indicted individuals be questioned concerning the charges pending in the indictment only in the presence of counsel, and because the defendants did not waive their constitutional rights intelligently, knowingly, and voluntarily. The government argues that the defendants had no right to counsel under *Massiah* since the indictment charging a violation of the controlled substance statutes had been dismissed before the IRS ever contacted the defendants, and the defendants obviously had not been indicted before the investigation for the income tax evasion was completed. Further, the government contends that the defendants did, in fact, waive any constitutional rights that they retained when they were interviewed by the IRS agents.

■ In *Massiah*, the Supreme Court held that an accused "was denied the basic protections of the [Sixth Amendment] [when the government introduced the defendant's own statement against him] which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Id.* at 206. Thus, if in fact Chu had been indicted on the income tax evasion charges at the time of his interview with IRS agents Hinkle or Schroer, any statements made by Chu without the presence of legal counsel would have been inadmissible against him on the tax evasion charges as *Massiah* prohibits the admission of statements against a defendant when "deliberately elicited from him after he had been indicted and in the absence of counsel." During the period Hinkle and/or Schroer interviewed Chu, the controlled substance indictment had

been dismissed and was no longer pending, and he was a free man, not as yet having been indicted on the tax evasion charges. Consequently, Chu's counsel in a novel but not too clever way seeks to expand upon the protection *Massiah* affords one under indictment to cover statements made after the dismissal of that indictment. Neither Chu nor his counsel have provided any authority to support this position, but contend in another novel argument that the DEA investigation and the IRS investigation should be considered as one investigation since the DEA was the source of information concerning the defendants, and also argues that the dismissal of the DEA indictment did not terminate the defendants' *Massiah* rights.

■ We need not discuss whether the defendants' *Massiah* rights terminated with the dismissal of the DEA indictment as Chu's argument fails because the subsequent indictment and conviction involved an entirely different offense—income tax invasion.

> "*Massiah* offers no immunity from liability for uncounseled, and post-indictment statements that involve different criminal acts. Such statements, even though deliberately elicited by government agents after indictment and in the absence of counsel, may form the basis for a separate indictment and may be offered to prove such additional charges.... *Massiah* is limited to holding that incriminating *statements made by indicted defendants out of the presence of counsel may not be admitted at trial to prove the charge in the pending indictment.*"

*United States v. Grego*, 724 F.2d 701, 703 (8th Cir.1984) (emphasis added). In *Grego*, a conversation between two defendants in the absence of counsel was recorded *after* the defendants had been indicted by a federal grand jury in Georgia on a charge of importation of marijuana. The defendants were subsequently indicted by a federal grand jury in Arkansas for conspiracy to possess marijuana and the trial court admitted evidence of the conversation record-

ed after the return of Georgia indictment. The court concluded:

"Although both indictments involve marijuana, the acts on which they were based were separate and distinct and did not amount to a single criminal offense....

When the tape of the conversation was made [the defendants] had not been indicted on any offense for which the tape was later used against them; therefore, we affirm the district court's refusal to apply *Massiah* to exclude the tape."

*Grego*, 724 F.2d at 703.

The court in *United States v. Lisenby*, 716 F.2d 1355 (11th Cir.1983) (en banc) (per curiam), was presented with a similar fact situation and reached a similar conclusion. In *Lisenby* the defendant had been arrested and charged with possession of marijuana. The government recorded conversations involving the defendant after he had been released (while the possession charge was still pending) and subsequently indicted the defendant for conspiracy and possession with intent to distribute marijuana. The trial court admitted the taped conversation into evidence at the trial for conspiracy and possession with intent to distribute marijuana. The Eleventh Circuit upheld the admission of the recorded conversation, reasoning that, "The Sixth Amendment right to counsel attaches once adversary proceedings have been commenced, but it attaches as to *those* adversary proceedings and not other offenses.... The admission of statements made after the initial arrest in the trial for a subsequently charged offense is not contrary to *Massiah*." 716 F.2d at 1359 (emphasis in original) (citation omitted).

The defendants in the case at bar were initially indicted on drug-related charges. Only after the drug-related charges were dismissed and the defendants were free of any criminal charges did the IRS elicit the statements from the defendants that were subsequently introduced at their income tax evasion trial. The income tax evasion charge was completely separate and distinct from the charge of improper record keeping and improper distribution of a controlled substance recited in the prior indictment. Following the reasoning of *Grego* and *Lisenby*, the defendants' statements are admissible since at the time the statements were made, the defendants "had not been indicted on any offense for which the [statements were] later used against them." *Grego*, 724 F.2d at 703. Furthermore, Chu's argument for suppressing the statements to the IRS agents in this case is even weaker than that rejected by the Eighth and Eleventh Circuits in *Grego* and *Lisenby* respectively since at the time of the defendants' statement to the IRS agents in the instant case, no indictment was pending against them. Thus, we hold that the trial court properly admitted the statements the defendants made to IRS agents prior to their indictment for income tax evasion.

■ Chu also contends that he and Cheng did not waive their constitutional rights when they made statements to the IRS agents. Chu fails to delineate or explain what, if any, constitutional rights the defendants had not waived, much less which of their constitutional rights they did not understand. As we have just concluded, *Massiah* does not apply to the statements the defendants made to the IRS agents since, at the time of the defendants' statements, they had not as of that date been indicted for income tax evasion. Since the defendants were not in custody at the time of other statements to IRS agents, *Miranda v. Arizona*, 384 U.S. 436 (1966), does not require that the defendants be admonished of their rights before questioning. *Beckwith v. United States*, 425 U.S. 341, 347 (1976); *United States v. Mapp*, 561 F.2d 685, 688 (7th Cir.1977); *United States v. Fitzgerald*, 545 F.2d 578, 581 (7th Cir.1976). Chu contends that because he and Cheng did not understand that the IRS was conducting a criminal investigation, they did not intelligently, knowingly, and voluntarily consent to make statements to the IRS.

■ The Supreme Court recognized in *Beckwith* that "noncustodial interrogation might possibly in some situations, by virtue

of some special circumstances, be characterized as one where 'the behavior of ... law enforcement officials was such as to overbear the petitioner's will to resist and bring about confessions not freely self-determined....' " 425 U.S. at 347–48. In the case before us, Hinkle testified that before asking the defendants any questions, he read aloud to the defendants from an IRS warning card:

"[O]ne of my functions is to investigate the possibility of criminal violations of the Internal Revenue laws.... Under the Fifth Amendment to the Constitution of the United States I cannot compel you to answer any questions or to submit any information.... [A]nything which you say may be used against you in any criminal proceeding which may be undertaken, [and] you may, if you wish, seek the assistance of an attorney before responding."

Chu testified at the suppression hearing held before trial that he is a naturalized citizen of the United States, that he began to learn the English language in his grade school years in China, that he took postgraduate courses at New York University in English after his arrival in the United States, and that he had been practicing psychiatry in this country for more than 20 years. Chu also conceded it was of the utmost importance for him in the practice of medicine, and particularly psychiatry, to understand a patient in order that he might make a proper diagnosis. Further, it seems obvious that the State of Indiana would require that medical doctors be able to fully understand and converse in the English language before granting a license to practice medicine in Indiana. The record also reveals that the defendants were knowledgeable in the field of financial affairs, with sophisticated investments in stocks, real estate, and a medical partnership. Chu acknowledged that he understood the language Hinkle used when explaining the defendants' rights, and after Hinkle recited the standard IRS statement advising the defendants of their rights, the defendants both responded "Yes" to Hinkle's question whether they understood

their rights. Before going further with the interview, the defendants discussed whether it was advisable for them to obtain an attorney at this juncture in the investigation. Thus, there is ample evidence in the record supporting the conclusion that the defendants clearly, knowingly and intelligently understood the elements of the warnings read to them by Hinkle, the nature of the investigation, the nature of their rights, and thus that no "special circumstances" existed which would make defendants' statements anything but voluntary. We hold it was not error for the trial court to admit the statements the defendants made to the IRS agents.

### IV.

 Finally, Chu contends that he was denied a fair trial due to the Assistant United States Attorney's imputation of uncharged, unsupported criminal misconduct on the part of the defendants in closing argument in spite of the government's pledge not to offer evidence of uncharged criminal activity. During its closing argument, the government stated:

"Well, you have heard about the results of that [DEA] audit. You heard that they purchased during that period of January 1, '77 through February 23 of '78, before any returns were filed, that they had purchased 830,000, thousand capsules of—831,000 capsules in Logansport, or wherever they lived. Why? I didn't know there were that many people in Logansport or the other town that were so overweight that needed that kind of weight reduction. You heard they were mild uppers. These speckled birds, these robins eggs, what happened to the 698,000 pills that are missing? You think they don't have a value? You think they don't produce money? You would use your common sense and you can use your experience in life, and you can ask that question."

According to Chu, this argument "addressed no material issue in this tax case, was without evidentiary support, and violated repeated prosecutorial pledges on

which the defendant relied," and the denial of the defendant's motion for mistrial on the basis of this argument was reversible error under *Berger v. United States*, 295 U.S. 78 (1935), and *United States v. Meeker*, 558 F.2d 387 (7th Cir.1977).

"Although inflammatory argument may be grounds for reversal, the government should not be restricted to a sterile recitation of uncontroverted facts." *United States v. Scott*, 660 F.2d 1145, 1177 (7th Cir.1981) (*citing United States v. Falk*, 605 F.2d 1005 (7th Cir.1979), *cert. denied*, 445 U.S. 903 (1980)). Further we note that "we are to consider the prosecutor's conduct not in isolation, but in the context of the trial as a whole, to determine if such conduct was 'so inflammatory and prejudicial to the defendant ... as to deprive him of a fair trial....'" *United States v. Chaimson*, 760 F.2d 798, 807 (7th Cir.1985) (quoting *United States v. Zylstra*, 713 F.2d 1332, 1339 (7th Cir.), *cert. denied*, 464 U.S. 965 (1983)); *see also United States v. Young*, 105 S.Ct. 1038, 1045 (1985); *Jentges v. Milwaukee County Circuit Court*, 733 F.2d 1238, 1242 (7th Cir.1984). It is unquestioned that the prosecutor "may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also United States v. Young*, 105 S.Ct. at 1042; *United States v. Chaimson*, 760 F.2d at 809.

The prosecutor's statement concerning the missing Phendimetrazine clearly was material and proper to provide a possible source for additional taxable income as discussed in Section II.C. above. DEA Compliance Officer Joel Fries testified without objection that approximately 698,000 capsules of Phendimetrazine, known on the street as "speckled birds" or "robins eggs," were unaccounted for in the defendants' records, thus providing evidentiary support for the government's argument. Contrary to Chu's contention, the quoted passage of the prosecutor's argument does not claim that the defendants engaged in any criminal misconduct other than the tax

evasion charges they were convicted of. Rather, the prosecutor merely noted that nearly 700,000 Phendimetrazine tablets were unaccounted for and suggested that they had value and could produce income; the prosecutor never even inferred, much less stated that unrecorded sales of Phendimetrazine might be illegal. Viewed in the context of the trial as a whole, we conclude that the quoted passage of the prosecutor's argument was not "so inflammatory and prejudicial to the defendant ... as to deprive him of a fair trial." *Chaimson*, 760 F.2d at 809. While the prosecutor may have struck a "hard blow," in the context of the trial it was not a "foul blow." Accordingly, we hold that the prosecutor's closing argument was proper, and the district court's denial of the defendants' motion for a mistrial was not error.

## V.

The judgment of the district court is AFFIRMED.