UNITED STATES of America, Plaintiff-Appellee,

v.

Daniel F. MARRINSON, Defendant-Appellant.

No. 86-2443.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 13, 1987.

Decided Nov. 6, 1987.

---

James M. Shellow, Shellow, Shellow & Glynn, S.C., Milwaukee, Wis., for defendant-appellant.

Vilija A. Bilaisis, Asst. U.S. Atty., Anton Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD, POSNER, and MANION, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Various issues have arisen out of a jury's conviction of Daniel F. Marrinson, charged in a four-count indictment with filing false tax returns for the years 1978 through 1981, in violation of 26 U.S.C. § 7206(1).[1]

The defendant admits that he was a marijuana dealer in 1977 and a few years prior thereto, but he denies that he continued to generate significant income during the tax years. For the years 1978 through 1981, he claims, he lived very comfortably, but only because of a "cash hoard" he says he accumulated only through his sales of marijuana in the prior years. This hoard, he says, was in excess of $309,000. The government takes a different view. It contends that the defendant continued his marijuana sales and that the $309,000 represents his total unreported gross income earned during the years in question. The government used the indirect cash expenditures method to show the amount of the unreported income and when it was earned. The jury believed the government's version of the story and convicted the defendant.

## I. FACTUAL BACKGROUND

The defendant's early adult years were undistinguished. He married for the first time when he was twenty-one years old. The defendant and his first wife lived in a two-room apartment, and the defendant held a clerk's job for a short while, then booked entertainment for bars, and managed one bar which his former wife described as "dumpy." He tried catering with little success. Before their divorce in 1969 his first wife noticed small amounts of narcotics in their apartment.

In 1974 the defendant began living with the woman who, in 1975, became his second wife. They then moved from an apartment in Chicago to a rented two-bedroom home in Wheeling, Illinois. The evidence suggests that their financial condition improved somewhat because his wife was able to quit working. The defendant supplied her with about $100 every couple of weeks for their household expenses. Things took a significant turn for the better, it appears, when the defendant developed his marijuana business. Several other people were involved with him in that business, including Charles Spannuth and Ross Sheldon.

In 1977 the defendant and Sheldon, with whom he had been associated previously, purchased an apartment building in Chicago with the aid of a loan from a major savings and loan institution. On the loan application the defendant set forth his as-

---

1. Marrinson was sentenced to the custody of the Attorney General for three years on Count I, and for a consecutive term of one and one-half years on Count II. On Counts III and IV, he was placed on probation for concurrent terms of five years to run consecutively to his terms of incarceration. He was also fined a total of $20,000, ordered to pay the taxes due and to perform 5,200 hours of community service.

sets and liabilities along with Sheldon's. The down payment of about $9,000 and another payment of $15,143.32 were made with the defendant's personal funds. The government's evidence showed that between 1978 and 1980 Sheldon and the defendant were in the marijuana business together. They met a number of times, usually at a house the defendant had rented on wooded acreage in Fox River Grove, Illinois. One witness testified to helping Sheldon deliver a large bag of marijuana to the defendant at that location. There was evidence of a discussion between Sheldon and the defendant over a briefcase full of cash resting on the kitchen table.

During the taxable years the defendant had ample money to spend, using cash or cashier's checks purchased at various financial institutions by himself or by others for him. He sometimes purchased property through nominees. In 1978 he paid $152,000 for a house in Barrington Hills, Illinois, and asked his brother to obtain financing and take title in his name, not the defendant's. The defendant spent considerable sums in connection with this property; according to the government, he spent at least $80,000 in 1978, $34,000 in 1979, $39,000 in 1980, and $47,000 in 1981. These expenditures were for some basic things like a new roof and kitchen cabinets, but also paid for a greenhouse, landscaping, stereo equipment, and a hot tub. The defendant made the mortgage payments, and paid the taxes and insurance, using his brother's name.

Also in 1978 the defendant purchased another piece of property for $110,000: five acres in Crystal Lake, Illinois, improved with a house, garage, and barn. This purchase was made in the name of a development corporation with the defendant's attorney, Marvin Kamensky, acting as nominee for the defendant. The down payment, loan payments, and other expenditures were paid through an account of Kamensky's firm into which the defendant deposited money. The government's evidence showed that in this circuitous way the defendant spent a little over $61,000 on the property in 1978, $30,000 in 1979, and $28,000 in 1980.

In 1979 the defendant acquired interests in additional property. He rented a condominium with an option to buy in Sandburg Village, Chicago. The government produced evidence that the defendant spent a little over $23,000 on the condominium in 1979, $7,000 in 1980, and $12,000 in 1981. He also rented 3,100 square feet of warehouse space in Barrington, and a little farther away, he rented a beach front villa in Mexico. The defendant often made payments on these properties with cashier's checks showing a friend of the defendant, Patrick Cunningham, as remitter. That same year the defendant bought a lot in Mexico on which he built a house. He also bought several lots in Wauconda, Illinois, using his friend and a corporation to front the purchases, but using his own money.

The defendant had interests in property other than real estate. He bought two Jeeps in 1979, an antique Ford in 1978 or 1979, and in 1980 he bought a Mercedes. For several of the tax years he rented a Porsche for $700 per month. He bought a 26–foot racing sloop for $10,000 in San Francisco and had it transported to Chicago at an additional cost of $1,000. He bought some other things, too: stock, diamonds, art, furniture, fine wine, watches, and jewelry. During these years the defendant also did extensive first-class traveling in this country and abroad, and on one occasion he chartered a jet to attend a prize fight in Las Vegas.

On various occasions the defendant represented himself as a legitimate businessman, a restaurateur, tile importer, and owner of a finance company. All of these representations were false, but the defendant did operate a furnishings, accessories, and gift store called the Pink Flamingo from 1977 until 1982. The Pink Flamingo, however, was unprofitable.

In any event, the defendant was very successful with his marijuana business. According to calculations by the government, in 1978, a year for which he reported gross income on his tax returns of about $43,000, the defendant spent a net amount of about $159,000. In 1979, a year for

which he reported about $45,000, he spent a net amount of about $132,000. In 1980, a year for which he reported about $51,800, his best year according to his returns, he spent a net amount of about $117,000. In 1981, a year for which he reported about $43,000, he spent a net amount of about $113,000. His misdirected business abilities were very profitable. He actually paid taxes during the four years in question totalling about $83,000, but the government's evidence showed the sum paid to be a little short.

## II. ISSUES

The defendant raises seven general areas of issues and subissues: (1) the sufficiency of the evidence, (2) whether the jury should have been instructed about leads, (3) whether the defendant's opportunity to present his defense was restricted, (4) whether venue was proven, (5) whether the 1978 tax return charge was filed within the statute of limitations, (6) whether the indictment alleged actual falsity, and (7) whether the indictment gave adequate notice of the offense.

## III. DISCUSSION

### A. Sufficiency of the Evidence

The defendant claims the government's evidence was insufficient in four major respects. The test for reviewing sufficiency of evidence is well established. If, upon viewing all the evidence in the light most favorable to the government and drawing all reasonable inferences which can be drawn therefrom, "*any* rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt," we will affirm the conviction. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *United States v. Chu*, 779 F.2d 356, 361 (7th Cir.1985). The appellant, therefore, has a substantial hurdle to overcome in arguing insufficiency of the evidence.

The government utilized the cash expenditures method of proving that the defendant had additional income in each of the years charged, and offered evidence of a likely source of the unreported, taxable, income of approximately $309,000. The expenditure method is related to the net worth theory of proof. It is helpful to understand that relationship and the uses of each method.

■ The government uses the net worth approach in cases where specific items of taxable income cannot be shown precisely. In general the method permits a circumstantial conclusion that there is unreported taxable income if the taxpayer's net worth at the end of the period exceeds that at the beginning of the period and the increase cannot be attributed to reported income. *Taglianetti v. United States*, 398 F.2d 558, 562 (1st Cir.1968), *aff'd*, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969). The net worth method, however, is ineffective with a should-be taxpayer who consumes and during the year uses his "self-determined tax-free dollars" for goods, services, travel, etc. *Id.* The use of unreported income would not appear through net worth analysis as would lasting investments, such as real estate, for instance.

■ The cash expenditures method, as explained by Judge Coffin in *Taglianetti*, determines the amount of unreported income by "establishing the amount of [the defendant's] purchases of goods and services which are not attributable to the resources at hand at the beginning of the year or to non-taxable receipts during the year." *Id.* The government must establish beginning and ending net worth positions "with sufficient particularity to rule out or account for the use of a taxpayer's capital to pay for his purchases." *Id.* at 563; *see also United States v. Citron*, 783 F.2d 307, 310 (2d Cir.1986).

The Supreme Court prescribed the proof requirement in a net worth case in *Holland v. United States*, 348 U.S. 121, 132, 75 S.Ct. 127, 134, 99 L.Ed. 150 (1954). The government must establish, "with reasonable certainty," an opening net worth. *Id.* The distinction in the proof required in the cash expenditures presentation is set forth in *Taglianetti*, which takes account of the

fact that the difference between the two standards is sometimes blurred.

In a typical net worth case, as *Holland*, precise figures would have to be attached to opening and closing net worth positions for each of the taxable years to provide a basis for the critical subtraction. In a cash expenditures case reasonable certainty may be established without such a presentation, as long as the proof—as in this case—makes clear the extent of any contribution which beginning resources or a diminution of resources over time could have made to expenditures.

398 F.2d at 565.

The Second Circuit recognized the distinction in *United States v. Mastropieri*, 685 F.2d 776, 784 (2d Cir.), *cert. denied*, 459 U.S. 945, 103 S.Ct. 260, 74 L.Ed.2d 203 (1982). The *Mastropieri* court did not read *Holland* to require a formal net worth statement as of the beginning of each of the taxable years involved, but only to require that there be a reasonable allocation to the appropriate tax year. The court found that the government had met its burden of reasonably allocating net worth increases by showing that in each of the charged years the taxpayer's expenditures vastly exceeded the opening balance increased by any known nontaxable sources of funds. In *Taglianetti*, the First Circuit required no formal presentation of net worth, only a clear showing of "the extent of any contribution which beginning resources or a diminution of resources over time could have made to expenditures." 398 F.2d at 565.

■ In arriving at an opening net worth or cash on hand figure for any given year the government can use a source and application of funds analysis from a prior year. That is, after establishing net worth for the prior year, the government can then calculate the effect of income and disbursements. The government does not have to reestablish the taxpayer's net worth at the beginning of each taxable year with evidence independent of the other years. *United States v. Goldstein*, 685 F.2d 179, 181 (7th Cir.1982). It is possible to arrive

at the conclusion that a taxpayer had no cash on hand, using the source and application of funds analysis, by demonstrating that a taxpayer simply spent more than he otherwise had available to him during that time. *United States v. Terrell*, 754 F.2d 1139, 1147 (5th Cir.), *cert. denied*, 472 U.S. 1029, 105 S.Ct. 3505, 87 L.Ed.2d 635 (1985); *United States v. Boulet*, 577 F.2d 1165, 1169 (5th Cir.1978), *cert. denied*, 439 U.S. 1114, 99 S.Ct. 1017, 59 L.Ed.2d 72 (1979). Mathematical certainty is not required. *Terrell*, 754 F.2d at 1146.

The government followed those general principles in this case. This type of financial analysis and reconstruction is not a science that provides an exact answer, but it does provide a reasonable, circumstantial answer based on known facts and related assumptions. In this case the government began its calculations with the loan application dated July 7, 1977, submitted by the defendant and his associate to secure a loan from a savings and loan institution. In an interview the defendant sorted out on the financial statement his assets and liabilities from his associate Sheldon's. The analysis therefore began with the defendant's assets according to his own statement, a reliable starting point for these purposes. Although the defendant complains about how the analysis proceeded from there, the government resolved some doubts in favor of the defendant. For instance, the defendant claimed in a prior year some interest in a foreign bank account in which he said there was $10,000 or less. He was given credit for the full $10,000. According to the evidence, the defendant told a special agent that he had $8,000 in a checking account in a certain bank. Although the agents found no account at that bank in defendant's name, they did find a record of a safety deposit box and they credited him with the amount he claimed as if it had been in the safety deposit box.

The starting point analysis showed the defendant had a net worth of not more than about $87,000. By this type of analysis the midyear starting point was brought up to January 1, 1978, the beginning of the

first taxable year in question. The evidence demonstrated that the defendant had, at most, $96,000 cash available to him during that period, but he expended over $125,000. The overage of about $29,000 could not be accounted for, so it was not unreasonable for the government to assume that he had no cash on hand at the beginning of 1978. From that point the government's analysis proceeded separately year by year to determine the defendant's expenditures against which were credited nontaxable amounts received from gifts, loans, sales, etc.

The defendant claims that his sizeable "cash hoard," accumulated from marijuana sales in years prior to the indictment years, was sufficient to offset his alleged tax discrepancy for the later years. That is a convenient and not very original excuse, but there was some testimony to support his theory. Spannuth, with whom defendant had been in the marijuana business, testified about the defendant's marijuana activities in the 1970's. The defendant's third (and current) wife mentioned seeing "bales and bales and bales" of marijuana at their home in 1976. The defendant's mother-in-law also testified about money the defendant asked her to hold for him. The jury, however, may reasonably have found these witnesses' credibility to have been questionable. Neither the government in its investigation nor the jury at trial were bound to accept the "cash hoard" claim at face value in view of various opposing considerations, including the defendant's prior unimpressive personal and financial circumstances. The evidence in this present case strongly suggests that the "cash hoard" defense is fictional and an afterthought based on necessity. It became a factual jury question and was apparently rejected. *United States v. Fisher*, 518 F.2d 836, 842 (2d Cir.), *cert. denied*, 423 U.S. 1033, 96 S.Ct. 565, 46 L.Ed.2d 407 (1975).

Defendant also contends that even if he did in fact earn the substantial taxable income charged, the government failed to show in which particular year it was earned. It could all have been earned in one year, he claims, in which case the charges involving the other three years could not stand. *Holland* addresses the allocation problem in the net worth context, but a similar problem exists in this cash expenditures case:

> The statute defines the offense here involved by individual years. While the Government may be able to prove with reasonable accuracy an increase in net worth over a period of years, it often has great difficulty in relating that income sufficiently to any specific prosecution year. While a steadily increasing net worth may justify an inference of additional earnings, unless that increase can be reasonably allocated to the appropriate tax year the taxpayer may be convicted on counts of which he is innocent.

348 U.S. at 129, 75 S.Ct. at 132. This circuit recognized in *United States v. Scott* that although there must be sufficient evidence to show in what year the income was received, the evidence is viewed in the light most favorable to the government in support of the jury's conclusion. 660 F.2d 1145, 1174–75 (7th Cir.1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982). Moreover, the government does not have to use independent evidence to reestablish the taxpayer's net worth at the beginning of each taxable year. *United States v. Goldstein*, 685 F.2d 179, 181 (7th Cir.1982). It may rely on figures derived from previous years' calculations.

In considering the yearly allocation problem of the defendant's less affluent years, one can see that he developed his marijuana business into a thriving enterprise and thereafter prospered year after year. He concedes that prior to the years in question he had been very successful, but there is not the slightest sign that he gave up his lucrative illegal business without reason, content to live only on past successes. He continually went to considerable lengths to conceal his activities, a factor which the jury may consider. *See Mastropieri*, 685 F.2d at 785. No one pretends that the figures charged for each taxable year are exact. The defendant made precision impossible, but the circumstantial and direct evidence is sufficient to show substantial unreported income each year. As we men-

tioned earlier, after the government established an accurate starting point, it proceeded year by year to determine the defendant's expenditures, taking into account his nontaxable income. There was a pattern to his yearly financial activities that did not change substantially. A conviction does not depend on the showing of an exact amount. In fact, the defendant may have done even better than the government claims, because the government gave the defendant the benefit of the doubt, but that also is immaterial. The income was taxable and its concealment to avoid losing a share of it to the government was criminal. We believe the evidence on this issue was adequate, and the product of more than simple "assumption and guess work" as the defendant suggests.

■ The defendant also claims that the government's proof of a likely source of income was insufficient. It is not necessary to prove a likely source of income, in this case marijuana sales, and at the same time negate every other possible source of nontaxable income. One or the other will do. *United States v. Chu*, 779 F.2d 356, 366 (7th Cir.1985); *Goldstein*, 685 F.2d at 183. The defendant suggests that the trial evidence was insufficient because it revealed only nominal marijuana transactions during these particular tax years. The defendant overlooks the fact that the jury had evidence of the circumstances in which he met his associate from time to time: a secluded house where neither lived. They engaged in private conversations, at least once over a bag of marijuana, and an open briefcase full of cash. The jury could have inferred that many such conferences occurred in this location, and that the example with which they were presented was just part of a pattern of activity.

The defendant relies on *United States v. Bethea*, in arguing that the government did not prove a likely source of nontaxable income. 537 F.2d 1187 (4th Cir.1976). In that case the defendant claimed his brother, who was a narcotics dealer, gave the defendant envelopes to place in a safety deposit box which would become the defendant's property if anything happened to the narcotics-dealing brother. Something did happen, and the defendant claimed to have inherited the contents of the safety deposit box after his brother was knifed to death. *Bethea* turns on its own facts and does not compel reversal in this case where the evidence suggests that the defendant himself was engaged in an ongoing, lucrative, illegal enterprise. In *Bethea*, the government produced no evidence that the defendant was involved in the sale of narcotics. *Id.* at 1191.

Looking at the evidence as a whole, it is clear that the defendant got all the credit in the government's analysis that he reasonably deserved. The jury was presented with enough evidence to infer that the defendant continued his involvement in the sale of marijuana during the tax years. Direct proof of a defendant's likely source of income is not required, although in this case some direct evidence was presented. The jury needed only enough circumstantial evidence from which they reasonably could have found the marijuana business to have been the source of the increase in defendant's wealth. *United States v. Mackey*, 345 F.2d 499, 507 (7th Cir.), *cert. denied*, 382 U.S. 824, 86 S.Ct. 54, 15 L.Ed. 2d 69 (1965); *see also United States v. Costanzo*, 581 F.2d 28, 33 (2d Cir.), *cert. denied*, 439 U.S. 1067, 99 S.Ct. 833, 59 L.Ed.2d 32 (1979). It is clear that the jury was presented with enough evidence to find all the elements of the crime charged beyond a reasonable doubt.

## B. The Government's Duty to Investigate Leads

The defendant also claims that the government failed to investigate leads to cash on hand and other nontaxable sources of income.

■ Although the government is not required to negate all conceivable sources of nontaxable income, *United States v. Massei*, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958), *Holland* requires that in this type of case the government must check out all leads to nontaxable income reasonably susceptible of being followed. 348 U.S. at 135–36, 75 S.Ct. at 135–36. The

defendant claims to have provided one lead when the defendant's attorney advised the IRS special agent that a financial statement filed by the defendant with the lending institution and relied upon by the government as part of its starting point analysis did not include the cash actually on hand. The defendant does not explain why it did not include cash on hand, a curious omission since it was material to the application. The defendant's brief suggests that the defendant may have had as much as $500,000 cash on hand at the time he sought the loan. Nothing is suggested to explain the necessity of borrowing if that be true. The defendant also offers no explanation of where this cash was located except through oblique suggestions that the special agents during their investigation could have more thoroughly questioned certain people about cash on hand, safety deposit boxes and contents, whether a rented house contained a safe, and other similar details.

■ The government responds that it sought leads to sources of nontaxable income from the defendant on three occasions, but received none. Nevertheless, the government made an effort to find other sources by seeking documents and contacting defendant's friends, relatives, and associates, but to no avail. The defendant supplied no leads to the investigators as to how or with whom to check to verify the claimed cash hoard, or even how much he had hidden. The defendant, of course, has the right to remain silent, but in these circumstances he assumes some risk by doing so. *Mackey*, 345 F.2d at 506. The trial court found that the government had "investigated all reasonable possibilities for sources of information," and had adequately followed up on what leads there were. This satisfies the government's burden of negating possible nontaxable sources of income. *United States v. Hiett*, 581 F.2d 1199, 1202 (5th Cir.1978). We see no reason to set aside the trial judge's determination. Possibly the agents could have further questioned certain witnesses, but nothing suggests even now that truthful answers would have been helpful to the defendant.

The defendant claims the court failed to instruct the jury on so much of the defendant's defense as was dependent on the government's obligation to reasonably follow leads as to the source(s) of the defendant's income. The government contends that because the defendant gave the government no investigative leads, he was therefore not entitled to the instruction. *Compare United States v. Wright*, 593 F.2d 105, 107 (9th Cir.1979).

Although the defendant offered no investigative leads to the government it tendered a leads instruction, which the district court refused to give. When offering the leads instruction, however, the defendant's only support for the instruction was the statement that "the question of leads is a question for the jury." The defendant did not identify any factual investigative lead issues to which the instruction could pertain.

■ In order to preserve for appeal an objection to a district court's refusal of a proposed jury instruction, "a defendant must object, on the record, to the judge's refusal to tender the defendant's instructions, and must clearly state the reasons for his or her objections." *United States v. Douglas*, 818 F.2d 1317, 1320 (7th Cir. 1987). "Merely submitting instructions is not sufficient." *Id.* In this case, the defendant stated only that the leads issue "is a question for the jury." If this assertion does not satisfy the requirement of a clear statement of the reasons for the defendant's objection, then we must analyze the district court's refusal to tender the instruction under the plain error standard of review. *Id.;* Fed.R.Civ.P. 30. We need not rule on the adequacy of the objection, however, because the defendant was not entitled under any standard to have his proposed instruction submitted to the jury.

[A] defendant is entitled to an instruction on his or her theory of defense if: the defendant proposes a correct statement of the law; the defendant's theory is supported by the evidence; the defendant's theory of defense is not part of the charge; and the failure to include an

instruction on the defendant's theory of defense in the jury charge would deny the defendant a fair trial.

*Id.* at 1320–21. The defendant's theory fails to meet the second requirement of the test: it finds no support in the evidence. The fact that the defendant produced several witnesses at trial to testify about his claimed "cash hoard" did not constitute investigative leads the government failed to pursue. The government's efforts to search known leads without the defendant's help were all fully explored in the evidence. Therefore, the district court's refusal to give the requested instruction was proper. *See also United States v. Hawkins,* 823 F.2d 1020, 1024 & n. 4 (7th Cir.1987).

## C. Restriction of the Defendant's Opportunity to Present Defense

The defendant also complains that his defense was hindered because of the government's late disclosure of exculpatory evidence and an improper limitation hampering effective cross-examination of a government witness. *See generally Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The alleged exculpatory evidence at issue was certain government reports, including a Drug Enforcement Administration ("DEA") report, a United States Customs ("Customs") report, and a 1972 indictment dealing with the defendant's drug-related activities prior to January 1, 1978. The defendant, who did get these reports after trial began, now claims he had insufficient time to follow up on the reports and show that he acquired his wealth prior to the taxable years.

■ The government explains that prior to trial it turned over no reports about the defendant's activities in the preindictment years because it had none and knew of none. Defense counsel in his opening statement told the jury that "[f]rom 1970 through, oh, late 1976, early 1977, [the defendant] made a great deal of money selling a great deal of marijuana." The day trial began the defendant's counsel for the first time asked the government particularly to search DEA and Customs records for information that would support the de-

fendant's claim of doing illegal business in those years. The government did so and gave what little it found to the defendant the next day. That information was nothing more than a report that the defendant might have been involved as a courier in one marijuana transaction in 1972. Defendant's counsel then subpoenaed other government documents from Customs. The two files thus obtained contained only brief references to the defendant. The trial judge put it correctly when he said that what had been obtained could have been obtained in a more orderly manner earlier in the discovery process. In any event, the defendant did get the documents, although they contained little of value to defendant except, he claims, the names of others with whom the defendant may have been associated in drug-related activities. The identities of those persons, assuming they did help the defendant accumulate his abundant amounts of money, should not have been a mystery to him.

■ Defendant also objects to the court's restriction of his examination of a government agent about particular reports of defendant's pre–1978 drug-related activities. Outside the presence of the jury, defendant's counsel conducted a voir dire of the agent to explore the agent's knowledge of any narcotics transactions in which the defendant had been involved. That exercise produced nothing more than what was in the documents already turned over, which offered little or no support for the defendant's defense theory. The trial judge could have allowed the jury to hear some reasonable amount of this testimony, but since that testimony was of no consequence, no harm resulted from its exclusion.

## D. Venue

The defendant next argues that venue was not proven on any of the counts, and, further, that the jury had no venue instruction to guide it. The defendant claims in particular that nothing indicated that the alleged offenses were committed in the Northern District of Illinois, where defend-

ant was charged with "making and subscribing" the false tax returns.

 Venue may lie not only where the return was made and subscribed, but also where filed, or where the preparer received information from the defendant even though the defendant signed and filed the returns elsewhere. *United States v. Lawhon*, 499 F.2d 352, 355 (5th Cir.1974) (venue in a § 7206(1) case), *cert. denied*, 419 U.S. 1121, 95 S.Ct. 804, 42 L.Ed.2d 820 (1975); *United States v. King*, 563 F.2d 559, 562 (2d Cir.1977) (§§ 7201 & 7206(1) case) (dicta), *cert. denied*, 435 U.S. 918, 98 S.Ct. 1476, 55 L.Ed.2d 510 (1978); *see also United States v. Marchant*, 774 F.2d 888, 891 (8th Cir.1985) (§ 7201 case), *cert. denied*, 475 U.S. 1012, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986); *United States v. Gross*, 276 F.2d 816, 819–20 (2d Cir.) (§ 7201 case), *cert. denied*, 363 U.S. 831, 80 S.Ct. 1602, 4 L.Ed.2d 1525 (1960). To show any of these things requires only a preponderance of the evidence, which may include inferences drawn from circumstantial evidence. *United States v. Martin*, 732 F.2d 591, 593 (7th Cir.1984); *United States v. Kampiles*, 609 F.2d 1233, 1238–39 (7th Cir. 1979), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980). With that degree of leeway in proving venue, there remains no doubt that venue was proper in this case. Contrary to defendant's assertion, the place of signing a tax return does not control the determination of venue. The defendant's 1978 and 1980 (Counts I and III) original returns bear government stamps showing they were filed in the district. There was no evidence to dispute the significance of the government stamps. For 1979 and 1981 (Counts II and IV) there was ample circumstantial evidence to show proper venue. The returns were prepared by defendant's attorney at that time. His offices, according to the information on the return, were located in Chicago, Illinois. The defendant's business interests also were shown to be in the district. The defendant and his wife lived in the district. The defendant supplied the address (in the district) at which he lived when registering at hotels on his trips and for other pur-

poses. This circumstantial evidence of venue was sufficient.

 Venue arose as an issue at trial and is pursued on appeal because the witness who prepared defendant's 1978 tax return had no recollection about where he prepared the return. Another tax preparer in Chicago who prepared some of the defendant's tax returns between 1975 and 1982 stated that he recalled one return had been sent to the defendant in Mexico to review and sign, but he could not remember which one. Defense counsel also sought to show that another return may have been delivered to the defendant in Florida to review. That witness, however, could only say that the return had been reviewed by him, the preparer, while he was in Florida, but he was not sure how the return got to the defendant. Defense counsel then tried to get the witness to speculate about the possibility that one or more of the returns may have been prepared by him in Florida, but the trial court properly terminated the purely speculative cross-examination.

The defendant appears to have tried to make venue an issue with little or nothing to go on by using a few questions on cross-examination without offering anything else. That approach was not enough to make venue a serious issue. Therefore, no instruction on venue was necessary. Perhaps another trial judge would have given a venue instruction out of abundance of caution, but the failure to do so in this case was not error.

*E. Statute of Limitations*

Another error urged by the defendant is that the government failed to prove that the 1978 return (Count I) was filed within the statute of limitations, and, further, that the jury was not instructed on the problem. The defendant takes the position that the statute of limitations begins to run at the time of signing or filing a tax return, not on its due date.

 The 1978 return was received by the Internal Revenue Service on March 22, 1979, more than three weeks before its due date on April 15, 1979. The defendant was

indicted on April 12, 1985. The statute provides that indictments are to be brought within six years after the commission of the offense.[2] The issue raised is therefore when the offense of "making and subscribing" a false tax return takes place in order to begin the running of the statute. The Supreme Court in *United States v. Habig*, 390 U.S. 222, 88 S.Ct. 926, 19 L.Ed.2d 1055 (1968), said that the taxpayer cannot control the time the statute of limitations begins to run by filing before the due date. The due date remains the standard time when the statute begins to run. 390 U.S. at 225, 88 S.Ct. at 928.

The Third Circuit in *United States v. Zudick* followed the reasoning of *Habig* and held that in a prosecution for false declarations under penalties of perjury brought under 26 U.S.C. § 7206(1), a prosecution similar to the present case, the due date, not the actual date of filing, controlled the running of the statute. 523 F.2d 848, 849–51 (3d Cir.1975). *Accord United States v. Akmakjian*, 647 F.2d 12, 13 n. 2 (9th Cir.) (per curiam), *cert. denied*, 454 U.S. 964, 102 S.Ct. 505, 70 L.Ed.2d 380 (1981). The defendant's arguments to the contrary are to no avail. General statements that "criminal statutes of limitation are to be liberally interpreted in favor of repose," *United States v. Marion*, 404 U.S. 307, 322 n. 14, 92 S.Ct. 455, 464–65 n. 14, 30 L.Ed.2d 468 (1971), do not change the time element in this tax case. The applicable rule does not, as defendant argues, permit the statute to be enlarged on the whim of the prosecutor. No instruction was required, but in any event the defendant tendered none, and therefore waived this non-issue.

### F. Allegations of Actual Falsity in the Indictment

Before trial, the defendant argued in an unsuccessful motion to dismiss that the indictment by which he was charged did not contain any allegation of actual falsity in his tax returns; it merely alleged that the defendant believed there was falsity. Upon conclusion of the trial, the district court instructed the jury that "[t]o sustain the charge of wilfully filing a false tax return, the government must prove ... the tax return was false as to a material fact." The defendant argues that if actual falsity is an element of the offense, it should have been alleged in the indictment. If actual falsity was not an element and was not charged, then, the defendant argues, he could theoretically be punished for his state of mind when his return might in fact have been correct.

The government points out that the indictment tracks the statute,[3] and is comparable to indictments that we have found to be sufficient under the statute. *See, e.g., United States v. Accardo*, 298 F.2d 133, 134 (7th Cir.1962). The government also notes that the indictment contains additional allegations which the defendant has overlooked. The indictment not only charges that the defendant did not believe certain things about the return to be true, but that he "well knew" that he had received other income. There was no doubt about what the charge was and what the case against him was about: the filing of a false return known by the defendant to be false. *Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *United States v. Conley*, 826 F.2d 551 (7th Cir.1987); *United States v. Galiffa*, 734 F.2d 306, 312 (7th Cir.1984).

### G. Adequate Notice of Offense in Indictment

Finally, the defendant argues that the court erred in refusing to dismiss the indictment for its failure to give adequate notice of the offense with the specificity required by the sixth amendment. The de-

---

**2.** 26 U.S.C. § 7206(1).

**3.** Section 7206 states in pertinent part:
Any person who—
(1) *Declaration under penalties of perjury.—* Willfully makes and subscribes any return, statement, or other document, which contains

or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; ...

....

shall be guilty of a felony....

fendant attempts to draw a distinction between the warning on the face of the return that the defendant's entries thereon are made "under penalties of perjury," and the provision under the statute charged to have been violated, section 7206(1), which provides different penalties. The defendant asserts that after the statute changed in 1949, when the new tax code first specified its own penalties as substituted for the former penalties for perjury, the tax forms themselves failed to keep up to date about penalties and therefore were misleading and prejudicial.

As we have discussed, the indictment tracked the statute and adequately advised the defendant of each element of the offense with which he was charged. It was clear to the defendant that he was not charged with the crime of perjury. The district court correctly resolved this issue in its opinion.[4] The Fifth Circuit also has addressed this issue, in *Escobar v. United States,* 388 F.2d 661, 664–65 (5th Cir.1967), *cert. denied,* 390 U.S. 1024, 88 S.Ct. 1411, 20 L.Ed.2d 282 (1968). That court dismissed the "penalty of perjury" language still appearing on the face of the return as a mere historical remnant without significance, beyond indicating, as a "catch phrase," what types of documents are covered by the statute. The Fifth Circuit also noted that the penalty for a violation of section 7206(1) is much lighter than the penalty for perjury. *Id.* at n. 6.[5]

### IV. CONCLUSION

The defendant has fully explored every possible or arguable error in this case, but we recognize none, and therefore the conviction is

AFFIRMED.

---

**4.** *United States v. Marrinson,* 620 F.Supp. 198, 201–02 (N.D.Ill.1985).

---

**5.** The maximum perjury penalty is five years, 18 U.S.C. § 1621, whereas the penalty applicable in this case is three years.