WILLIAM R. BEYER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Beyer v. Commissioner
Docket No. 33692-85.
United States Tax Court
T.C. Memo 1988-261; 1988 Tax Ct. Memo LEXIS 287; 55 T.C.M. (CCH) 1080; T.C.M. (RIA) 88261; June 20, 1988. Samuel Coon, for the petitioner. Randall G. Durfee, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in and additions to petitioner's income taxes as follows: Section 6653(b) [1]
Year
Deficiency
Addition to tax
1974
$   2,438.28
$   1,219.14
1975
45,615.97
22,807.98
1976
11,254.63
5,627.31
1977
44,862.90
22,431.45
1978
3,514.53
1,757.26
The issues for decision are: (1) whether petitioner had unreported taxable income in the amounts determined by respondent, (2) whether part of any underpayment in petitioner's income tax for the year was due to fraud within the meaning of section 6653(b), and (3) whether the statute of limitations bars the assessment of any underpayment *289 of tax. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits associated therewith are incorporated herein by reference. Petitioner resided in Idaho at the time his petition was filed herein on September 3, 1985. He timely filed individual income tax returns for each of the calendar years 1974 through 1978 using the cash method of accounting. At the time of the trial in June of 1987 petitioner was 73 years of age and most of his working life had been spent in the cheese-making industry. Beginning in 1932 petitioner, at the age of eighteen, was engaged in Wisconsin in a cheese manufacturing business with his brother-in-law. In 1943 petitioner acquired a beer parlor which he operated until about 1946, when he sold the beer parlor and invested the proceeds in a small cheese plant of his own. Eventually his cheese plant was sold and petitioner became involved in a profitable dairy operation in Michigan. By 1960, petitioner had accumulated a number of assets including some equipment previously used in his cheese plant, a 226 acre dairy farm, a lakeshore cottage, an airplane, 28 milk cows, 22 yearling heifers, various *290 pieces of farm equipment, 2 milk trucks, a milk route, and 2 tractors. Some of the assets including the dairy farm were encumbered but the exact amount of the encumbrances cannot be determined from the record. In 1961 petitioner, with his wife and seven children, liquidated the dairy farm, herd, airplane, cottage, milk route, milk trucks and most of the farm equipment, and purchased a tractor trailer which was used to transport the family's household and personal effects as well as certain items of unsold farm and cheese equipment to Sandpoint, Idaho, where petitioner established a cheese manufacturing business known as Pend Oreille Cheese Company. In Idaho petitioner purchased a warehouse for use as a factory and sales rom in the cheese business and exchanged the tractor trailer for a tavern which had living quarters. His initial investment in the cheese business including the warehouse was at least $ 60,000 which petitioner had realized from the dairy liquidation in Michigan. [2] In 1964 petitioner incorporated the cheese business under the name of Pend Oreillle Cheese Company, Inc. (Pend Oreille), a Small Business Corporation within the meaning of section 1371. Pend Oreille *291 filed timely corporate tax returns on Forms 1120S using the accrual method of accounting for the fiscal years ending on August 31 of 1974 through 1978. During such years petitioner owned 99% of Pend Oreille's outstanding stock and was responsible for 99% of its net income. From 1962 until 1966 petitioner was actively engaged in the operation of both the tavern and the cheese business but his income for those years was minimal. In fact, his income was not enough to require the filing of tax returns in 1962 through 1964 and he did not report any income tax liability on his returns for 1965 and 1966. In 1966 petitioner and his wife were divorced and she acquired the tavern in settlement of her marital rights while petitioner retained the stock of Pend *292 Oreille. [3] After the divorce petitioner resided in a small portion of Pend Oreille's warehouse which he had converted into very sparse living quarters. Initially Pend Oreille's business was the manufacture and sale of cheese but subsequently it was expanded to include the purchase of bulk cheese for packaging and resale. During the years under consideration most of its products were sold within about 160 miles of Sandpoint to both wholesale and retail customers. Most of Pend Oreille's retail customers and some of its large wholesale customers paid with cash instead of checks. All payments were made directly to petitioner or were turned over to him by employees of Pend Oreille on a daily basis. No one other than petitioner kept any record or had any knowledge of the amounts collected from the cheese sales. Receipts were temporarily kept in safes located in petitioner's living quarters or at other points in the warehouse. Some of the receipts were deposited with banks or other financial institutions. During 1974 through 1978, Pend Oreille operated a retail store located at the cheese *293 factory in Sandpont. Petitioner's daughter, Deanna Hiatt (now Deanna Allured), operated the cash register and pursuant to petitioner's instructions set aside all silver quarters and dimes used by customers in payment for cheese. The silver coins were turned over to petitioner in exchange for currency. In addition to cheese sales, Pend Oreillle received income in the form of interest and rents from real estate during the years at issue. On the dates and for the amounts shown, the following properties were purchased by petitioner in the name of Pend Oreille: DATE
LOCATION OF PROPERTY
PRICE
Sandpoint, Idaho
1/75
Lot 1, Block 4, Come Back Bay
[4] $ 15,500
7/75
Lots 1-4, Block 53
[5]  44,000
1/76
Lot 2, Block 3, Come Back Trail
[6]  25,086
9/76
708 Merten Avenue
[7]  36,000
7/77
Lots 1-2, Block 6, Weils 2d
[8]  39,950
2/78
Lot 19, Block 19, Laws 2d
[9]  30,000
Hillyard, Washington
10/77
Lot 2, Block 13
5,000
Opportunity, Washington
2/78
Lot 7, Block 239
[10] 157,500
*294 Over the years, Pend Oreille obtained business loans from various financial institutions. In 1964 $ 14,000 was borrowed from the Bank of Idaho. In 1966 $ 88,000 was borrowed from the Small Business Administration. Six loans totaling $ 109,000 were obtained from the Bank of Idaho in 1971, 1973, and 1979. To obtain each of the above loans petitioner prepared a financial statement. Some of the financial statements purport to be individual statements for petitioner, but they include assets and liabilities of Pend Oreille. None of the statements prepared prior to 1974 contain any indication that Pend Orielle or petitioner possessed large amounts of undeposited cash. However, a financial statement dated September 4, 11976, states that petitioner had "Cash on Hand and in Bank of Idaho" of $ 40,871.62 and "Cash, Savings Accounts and [a] Time C.D." of $ 33,000. During the years under consideration petitioner's only source of income was from Pend Oreille and he frequently used Pend Oreille's assets for personal purposes. For example, petitioner did not have a personal checking account but paid his personal expenses with cash withdrawals from the corporation. [11] As previously stated, *295 petitioner did not own a personal residence, but resided in living quarters located in the warehouse owned by Pend Oreille. At no time during the years at issue did he own a personal automobile. Instead he drove automobiles leased by the corporation for both business and personal purposes. Petitioner also used corporate funds to finance the purchase of homes for his children, Deanna Hiatt and Richard Beyer, [12] and Pend Oreille's funds were also used to make loans to members of his family and to friends. In 1975 petitioner used Pend Oreille's checks to purchase five bags of silver coins and 10 Austrian gold coronas from Mr. McTy's Coin Shop for approximately $ 22,000. The purchases were made in the name of Kaniksu *296 American Mining Company. Petitioner and Pend Oreille were involved in two burglaries or robberies one in 1974 and again in 1977. On December 2, 1974, approximately $ 20,000 in coins, currency, and checks were taken from a factory safe in which petitioner kept Pend Oreille's daily receipts. A portion of the theft loss was recovered from an insurance company and the balance of $ 14,950 was deducted as a casualty loss on Pend Oreille's corporate return. On November 8, 1977, a second burglary occurred in petitioner's living quarters at the warehouse when three bags of coins and several rolls of currency were taken from a floor safe used by petitioner to store Pend Oreille's receipts and other property. During an investigation by local authorities two old bags of coins were found still in the safe. The bags were so badly rotted that one was in shreds and the other came apart when an investigator attempted to remove it from the safe. The two bags contained coins totalling approximately $ 1,000. It was estimated by petitioner and the investigators that $ 69,000 was identified as the property of Pend Oreille and this amount was deducted as a theft loss by the corporation. A record *297 of Pend Oreille's income and expenses was made by petitioner using a single entry method of accounting in which he purportedly recorded income in each year based upon invoice sales (by purchaser name) and separately accounted for income from "Store Sales." In addition, other categories of income appear in the corporate records as follows: For the tax year ending August 31, 1975, petitioner included a category for "Other Sales" for the months of September, November, December, January and June which totaled $ 51,539.45. For the 1976 tax year, petitioner included a category for "Other Wholesale" for the month of September which totaled $ 5,000. In 1976 he also showed a category for "Other Cash Sales" or "Cash Sales" for the months of October, December, March, April, June, July and August which totaled $ 63,864.95. For the 1977 tax year, petitioner included a category for "Other Sales Cash" for the months of October, November and December in the amount of $ 27,534.84. The tax returns of Pend Oreille were prepared by Bill Sage, an accountant, from income and expense summaries provided by petitioner. Mr. Sage never had access to Pend Oreille's actual records which were always in the *298 possession of petitioner. Mr. Sage also prepared petitioner's individual tax returns from summaries of income and expense prepared by petitioner. No individual income tax returns were filed by petitioner for 1962 through 1964 because, according to petitioner, his income was not enough to require filing. He filed individual income tax returns for 1965 through 1973 which reflected tax liabilities as follows: YEAR
TAX LIABILITY
1965$    0
1966
0
1967
745
1968
308
1969
2,280
1970
1,388
1971
0
1972
0
1973
0
For 1974 through 1978, the tax years at issue, petitioner filed individual returns on which he reported taxable incomes (or losses) and tax liabilities as set forth below: YEAR
TAXABLE INCOME
TAX LIABILITY
1974
$    8,438 * $ 1,481
1975
(6,422)
0
1976
1,588 0
1977
4,227 0
1978
(41,360)
0
Pend Oreille's returns for the tax years ending August 31, 1974 through *299 August 31, 1978, reflect losses with the exception of the return for fiscal 1974 which shows a net income of $ 16,244. [13]
On May 5, 1979, Special Agent Warren Packard ("Packard") interviewed petitioner in the presence of his attorney, Everett Hofmeister, at the office of the Internal Revenue Service in Coeur d'Alene, Idaho. During the interview, which lasted approximately two and one-half hours, petitioner answered all of Packard's questions except a question concerning the amount of petitioner's inheritance from his mother. [14] In answer to a question by Packard petitioner stated that after the first burglary on December 2, 1974, he had no more than $ 400 or $ 500 in undeposited currency and no more than $ 400 or $ 500 in undeposited coins. Revenue Agent John Nilson ("Nilson") assisted Special Agent Packard in the audit of the returns *300 of Pend Oreille and petitioner. In the course of verifying the milk and cheese purchases claimed on Pend Oreille's returns, Nilson discovered that a purchase of $ 15,543.26 had been duplicated on the 1978 return. He also discovered that a purchase of coins for $ 8,177.50, was included as a purchase of cheese on the 1975 corporate return. Upon making these discoveries respondent's agents decided to determine petitioner's income with the use of the net worth method and making appropriate adjustments for (1) the one percent of Pend Oreille's stock which was not owned by petitioner and (2) the fact that in the preparation of their returns, Pend Oreille used a fiscal year ending August 31 while petitioner used a calendar year. During the audit respondent's agents were unable to identify specific items of omitted income and did not question any of Pend Oreille's employees with respect to such items or the possible source of unreported income for Pend Oreille or petitioner. Instead they chose to proceed on the basis of their net worth computation since it indicated that Pend Oreille and petitioner had purchased assets during 1974 through 1978 that exceeded in cost the total amount of *301 income reflected on their returns for those years. Since respondent's net worth computation with respect to Pend Oreille is the basis of respondent's case, a summary of the computation as set forth in respondent's statutory notice which was mailed to petitioner on July 2, 1985, is as follows: >100> >101> SUMMARY OF NET WORTH - PEND OREILLE CHEESE CO., INC. *
8/31/74 8/31/75 8/31/76 ASSETS
Cash on Hand
$    1,000.00
$     1,000.00 $  1,000.00 Additional Cash or
Accounts Receivable
6,223.74
Cash in Banks
56,200.75
58,860.62 40,203.95 Inventories
55,942.00
57,860.00 60,161.00 Accounts Receivable
34,556.97
29,582.38 35,161.49 Escrow Receivable
Contract Receivable
Loan Receivables
16,000.00
10,000.00 4,000.00 Coins
21,641.50 21,641.50 Equipment & Buildings
Accumulated Depr.
66,218.00
108,190.00 110,064.00 Properties
10,201.00
38,232.94 63,599.88 Earnest Money
500.00 TOTAL ASSETS
246,342.46
325,367.44 336,331.82 LIABILITIES:
Accounts Payable
27,580.92
35,809.62 26,707.51 Escrows
TOTAL LIABILITIES
27,580.92
35,809.62 26,707.51 NET WORTH
218,761.54
289,557.82 309,624.31 LESS: Beginning Net Worth
(218,761.54)
(289,557.82)
Increase in Net Worth
70,796.28 20,066.49 ADD: Nondeductible
expenditures
17,587.16 11,194.36 LESS: Nontaxable income
Surrendered Life Ins.
Inheritance
Deanna Hiatt
TAXABLE INCOME
$    88,383.44 $    31,260.85 *302 8/31/77 8/31/78 ASSETS
Cash on Hand
$     1,000.00 $     1,000.00 Additional Cash or
Accounts Receivable
Cash in Banks
46,892.27 47,047.18 Inventories
66,295.00 60,349.00 Accounts Receivable
45,972.20 58,614.31 Escrow Receivable
22,189.83 11,703.39 Contract Receivable
54,198.70 27,846.15 Loan Receivables
4,000.00 1,830.94 Coins
21,641.50 8,177.50 Equipment & Buildings
Accumulated Depr.
146,118.00 334,761.00 Properties
10,201.00 15,327.72 Earnest Money
TOTAL ASSETS
418,508.50 566,657.19 LIABILITIES:
Accounts Payable
15,273.37 8,423.69 Escrows
142,700.82 TOTAL LIABILITIES
15,273.37 151,124.51 NET WORTH
403,235.13 415,532.68 LESS: Beginning Net Worth
(309,624.31)
(403,235.13)
Increase in Net Worth
93,610.82 12,297.55 ADD: Nondeductible
expenditures
19,755.40 18,817.73 LESS: Nontaxable income
Surrendered Life Ins.
(15,128.98)
Inheritance
(14,444.76)
Deanna Hiatt
(17,676.50)
TAXABLE INCOME
$    83,792.48 $ 13,438.78 *303 At trial the parties stipulated that respondent's net worth computation is correct with the following exceptions: (1) Petitioner contends that the cash on hand [15] at August 31, 1978, of $ 1,000 was greatly understated; (2) Petitioner contends that in addition to the $ 14,444.76 in nontaxable income shown in the computation as being inherited from his mother, Deanna Beyer, he also received a $ 2,500 bond from her estate; (3) With respect to nondeductible expenditures used in the computation respondent concedes that the following amounts are deductible in the years shown: YEAR ENDED
AMOUNT
8/31/75
$ 4,369.37
8/31/76
2,060.79
8/31/77
1,528.59
8/31/78
4,568.98
(4) With respect to nondeductible expenditures petitioner concedes that the following amounts are nondeductible in the years shown: YEAR ENDED
AMOUNT
8/31/75
$    766.73
8/31/76
2,794.10
8/31/77
2,475.99
8/31/78
4,830.78
(5) The parties agree that with respect to the nondeductible *304 expenditures the following amounts should be capitalized in the years shown: YEAR ENDED
AMOUNT
8/31/75
10,995.44
8/31/76
1,361.67
8/31/77
9,739.71
8/31/88
4,664.96
(6) The parties agree that only the remainder of the amounts shown in the computation as nondeductible expenditures remain in dispute. These amounts are as follows for the years shown: YEAR ENDED
AMOUNT
8/31/75
$ 1,455.62
8/31/76
4,977.80
8/31/77
6,011.11
8/31/88
4,753.06
In 1982 petitioner was tried on three separate occasions in the United States District Court for Idaho for attempting to evade and defeat the payment of income taxes for each of the years at issue in violation of section 7201. Each trial resulted in a mistrial, once because of the illness during the proceeding of petitioner's counsel and twice because the jury was unable to reach a unanimous verdict. VERDICT
Frand and Amount of Deficiencies.
We will first consider the issue of whether or not the returns filed by petitioner for 1974, 1975, 1976, 1977 and 1978 were fraudulent *305 within the meaning of section 6653(b). We do this because the statutory notice of deficiency was issued more than three years after the due dates of the returns and the resolution of the fraud issue will not only dispose of the question of petitioner's liability for the addition to tax under section 6653(b) but also the question of whether an assessment for such years is barred by the three-year statute of limitations provided by section 6501(a). In the process of resolving the fraud issue we will also review the correctness of respondent's computation of the deficiencies. The burden of proof on the fraud issue is on respondent. Section 7454(a); Rule 142(b). Part of that burden is to establish that there was some underpayment of tax in each year. Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972) affg. a Memorandum Opinion of this Court; Hebrank v. Commissioner,81 T.C. 640, 642 (1983). Respondent undertook to carry this part of his burden by determining the annual net worth increases of Pend Orielle during such years and adding thereto nondeductible *306 expenditures and subtracting therefrom nontaxable income. The use of such a method is proper where the taxpayer has failed to keep or produce complete books and records for the years at issue. Under such circumstances respondent is authorized by section 446 to compute income by any method, which in his opinion, clearly reflects income. See Moore v. Commissioner,722 F.2d 193, 196 (5th Cir. 1984), affg. a Memorandum Opinion of this Court; Sutherland v. Commissioner,32 T.C. 862 (1959). Furthermore, in such a case respondent has great latitude in adopting a method for reconstructing a taxpayer's income and the method adopted need only be reasonable in the light of all the surrounding facts and circumstances. Giddio v. Commissioner,54 T.C. 1530, 1533 (1970); Schroeder v. Commissioner,40 T.C. 30, 33 (1963). In this case, petitioner first contends that respondent's use of the net worth method is improper because respondent has failed to demonstrate that the single entry records kept by petitioner for Pend Oreille are *307 inadequate. The contention, however, has no merit because the use of the net worth method has not only been long considered an acceptable method of proving income where the taxpayer's records are non-existent or clearly inadequate but it is also an acceptable method of testing their accuracy and reliability, i.e., the adequacy of the taxpayer's records. See Davis v. Commissioner,239 F.2d 187, 189 (7th Cir. 1956), cert. denied 353 U.S. 984 (1957); Bushnell v. Commissioner,49 T.C. 296, 307 (1967). We have found that early in their audit of the records kept by petitioner for Pend Oreille, respondent's agents discovered substantial errors, i.e., the duplication of a cheese purchase in the amount of $ 15,543.26 during 1978 and a purchase of coins for $ 8,177.50 in 1975 which was recorded as a purchase of cheese. It is apparent, therefore, that respondent's use in this case of the net worth method to test the overall accuracy and reliability of the available records was proper. Bushnell v. Commissioner,supra.Furthermore, *308 its use in this case clearly established that during each of the years 1974 through 1978 petitioner and Pend Oreille purchased assets at a cost which substantially exceeded the total amount of income reported on their returns. Petitioner also argues that respondent's use of the net worth method is improper in this case because respondent's agents failed to investigate certain leads as to nontaxable explanations for the net worth increases and failed to produce proof of a likely source for the unreported income. In support of this argument, petitioner points out that the agents were unable to identify any specific item of omitted income or any person or firm who could buy or sell milk or cheese in compliance with applicable laws in sufficient quantities to account for the unreported income determined by respondent. This argument, however, overlooks the fact that the very purpose of the net worth method is to prove unreported income by circumstantial evidence in situations where proof of specific items is not possible or cannot be shown precisely. See United States v. Marrinson,832 F.2d 1465 (7th Cir. 1987). Moreover, from the record as a whole we are satisfied *309 that respondent has shown with clear and convincing evidence that the likely explanation for any understatement of taxable income was either unreported cash receipts or overstated expenses of Pend Oreille. With respect to the cash receipts of Pend Oreille the uncontradicted evidence clearly demonstrates that they were received by or given to petitioner upon their receipt, and after their delivery to petitioner, no other person ever had any access to the receipts or to any record which tended to verify their amount. With respect to the expenses of Pend Oreille the uncontroverted evidence, clearly leads to the conclusion that their nature, amount and recordation was solely within the personal control of petitioner and we are unable to accept his explanation that duplicating the entry of a purchase of cheese in the amount of $ 15,543.26 or the entry of a purchase of coins in the amount of $ 8,177.50 as the purchase of cheese are either honest mistakes or accidents. Under these circumstances we can find no merit in petitioner's argument that respondent's use of the net worth method was improper. Petitioner next argues that even if we conclude that respondent's use of the net worth *310 method is proper in this case, respondent' computation is incorrect because he failed to take into consideration the existence of a cash hoard which petitioner had accumulated prior to the years in issue. This argument is based on petitioner's testimony at trial that on August 31, 1974, he possessed in excess of $ 200,000 which was undeposited and stored in various locations including a floor safe in his living quarters, two safety deposit boxes, and a safe in the cheese factory. Petitioner's claim of a cash hoard is not unusual in this type of case. See Holland v. United States,348 U.S. 121 (1954). Nevertheless, it is a claim that cannot be taken lightly because "all calculations in a net worth case use the opening net worth as their starting point, it is obvious that this figure must be accurate." United States v. Carriger,592 F.2d 312, 313 (6th Cir. 1979). See also Graham v. Commissioner,T.C. Memo. 1985-411. Respondent's agent testified that August 31, 1974 was selected for the opening net worth because it was the closest year-end date of Pend Oreille to the burglary on December 2, 1974, and that $ 1,000 was used as *311 the beginning figure for cash on hand because in an interview on May 5, 1979, petitioner, in the presence of counsel, stated that after the burglary on December 2, 1974, he possessed no more than $ 400 or $ 500 in currency and no more than $ 400 or $ 500 in coins. At trial and on brief, petitioner admitted making the statement but argues that respondent's reliance upon his extrajudicial admission of only $ 1,000 cash on hand was not independently corroborated and, as such, was not shown with reasonable certainty. See Olender v. United States,237 F.2d 859, 860 (9th Cir. 1956), cert. denied 352 U.S. 982 (1957). His argument, however, conveniently disregards several facts clearly established by the record before us which do corroborate petitioner's admission. First, we are convinced that petitioner had accumulated a number of assets prior to the Michigan sale in 1961 and that from the sale of such assets he realized a substantial amount of cash. However, we are equally convinced that a substantial portion if not all of this cash was used to acquire and equip his cheese and tavern operations in Idaho and whatever cash hoard petitioner may have had *312 in 1961 was depleted long before August 31, 1974. Secondly, petitioner does not contend and the record does not indicate that his income from 1961 through 1973 was sufficient to permit the accumulation of any substantial amount of cash. Furthermore, the same is true with respect to the income of Pend Oreille from its incorporation in 1964 through August 31, 1974. Thirdly, the 1967 property settlement between petitioner and his former wife did not include any part of a cash hoard [16] even though she was apparently present during the Michigan liquidation in 1961 and presumably was aware at least to some extent of the amount received from the liquidation. Fourthly, as our findings reflect, prior to the net worth period both petitioner and Pend Oreille incurred substantial business indebtedness to various financial institutions without disclosing any substantial cash on hand. Petitioner testified that even though he had substantial amounts in cash during this period he borrowed money because it made good business sense. We are inclined to believe, *313 however, that an extensive pattern of borrowing, by a taxpayer during years in which the taxpayer claims to have a cash hoard, is evidence that no hoard existed. See Davis v. Commissioner,239 F.2d 187, 190 (7th Cir. 1956), cert. denied 357 U.S. 984 (1957). Furthermore, petitioner's testimony in this case as to the cash hoard is questionable because it is not only inconsistent with his statement to respondent's agents but is also inconsistent with respect to his testimony in the preceding criminal cases. Fifthly, petitioner's testimony to the effect that he did not deposit the cash hoard in a bank because he mistrusted banks is contradicted by our findings that individually and through Pend Oreille he dealt extensively with banks, had several checking and savings accounts, and acquired at least two certificates of deposit. From all the foregoing, we are satisfied that petitioner's admission that after the burglary on December 4, 1972, he had no more than $ 400 to $ 500 in currency and no more than $ 400 to $ 500 in coins has been independently corroborated *314 by respondent and further conclude that respondent's determination in the aforesaid net worth computation of cash on hand at August 31, 1974 of $ 1,000 is correct. Since Petitioner has failed to address on brief his unconceded portions of the nondeductible expenditures as well as the $ 2,500 bond which he purportedly received as an additional nontaxable inheritance from his mother, we assume he has abandoned these issues. Consequently, with respect to the net worth computation, we conclude that with the concessions made by respondent the net worth computation of respondent is correct and reflects clearly and convincingly the amount of an underpayment in income tax by petitioner for each of the years 1974 through 1978. We turn now to the question of whether respondent has carried his burden of proving by clear and convincing evidence that some part of the underpayment in each year is due to the fraudulent acts of petitioner. Section 7454(a); Rule 142(b); Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972); Hebrank v. Commissioner,81 T.C. 640, 642 (1983). *315 Respondent's burden is met if he has shown by such evidence that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3rd Cir. 1968), cert. denied 393 U.S. 1020 (1969); Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). The presence of fraud is a question of fact to be resolved from the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed but must be established by affirmative evidence. Drieborg v. Commissioner,225 F.2d 216, 218 (6th Cir. 1955); Beaver v. Commissioner,55 T.C. 85, 92 (1970). It may, however, be proved by circumstantial evidence because direct proof of a taxpayer's intent is rarely available and his entire course of conduct may be examined to determine whether the fraudulent intent is present. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-1-6 (1969). *316 From the record as a whole we are satisfied that respondent has clearly and convincingly proven fraud on the part of petitioner for the reasons set forth below. (1) Petitioner, a reasonably intelligent, highly competent and experienced businessman omitted substantial amounts of income for each of the years in question. Such persistent and substantial understatements of income over a period of years are persuasive evidence of a fraudulent intent to evade taxes. Estate of Mazzoni v. Commissioner,451 F.2d 197 (3d Cir. 1971); Merit v. Commissioner,301 F.2d 484 (5th Cir. 1962). (2) In his business activities and those of Pend Oreille petitioner used cash extensively which is some evidence of a fraudulent intent. Bradford v. Commissioner,796 F.2d 303 (9th Cir. 1986), affg. a Memorandum Opinion of this Court. (3) Petitioner failed to maintain adequate *317 books and records. This too is some evidence of fraud. Haprer v. Commissioner,54 T.C. 1121, 1141 (1970). (4) The available records for Pend Oreille were maintained by petitioner in such a manner as to conceal income and to disguise the personal expenditures of petitioner and members of his family as those of the corporation. Charging personal items to corporate business expense has been held to justify the imposition of additions to tax for fraud. See E. J. Benes & Co. v. Commissioner,42 T.C. 358, 383 (1964), affd. 355 F.2d 929 (6th Cir. 1966), cert. denied 384 U.S. 961 (1966), and cases cited therein. (5) During the examination process by respondent's agents, the previous criminal trials, and during the trial of this matter petitioner made conflicting and inconsistent statements about his alleged cash hoard which fluctuated in amounts from $ 1,000 to over $ 250,000. Such conflicting and misleading statements are evidence *318 of petitioner's continuing intent to evade the payment of taxes. See Grosshandler v. Commissioner,75 T.C. 1 (1980).
Statute of Limitations
In view of our conclusion with respect to fraud the assessment of the deficiencies due from petitioner is not barred by the statute of limitations. Section 6501(c)(1); Estate of Temple v. Commissioner,67 T.C. 143, 159-160 (1976). Because of concessions, Decision will be entered Under Rule 115.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided. ↩
2. From the record we are unable to determine the exact amount recovered from the liquidation. Petitioner testified that he received over $ 200,000; however, no corroborating documentary evidence was submitted and his testimony in earlier criminal trials. Nevertheless, we are satisfied that petitioner left Michigan with sufficient liquid assets to start the cheese business in Idaho, which we find required at least $ 60,000. ↩
3. Petitioner subsequently remarried in or about 1970, but was divorced after a year. ↩
4. This property was purchased for Richard Beyer, one of petitioner's sons. During 1975 and 1976 over $ 14,000 was expended to repair or complete the house and petitioner deducted the expenditures on the corporate returns. In 1977 Richard purchased the house for $ 29.000. ↩
5. Of the purchase price $ 33,000 was financed by the sellers. However, the loan was paid in full within one month. Most of the funds came from two certificates of deposit held by Pend Oreille This property was held by the corporation as rental property from 1975 through 1978. ↩
6. This property was sold in October, 1976, for $ 29,000. The sale was not reported by petitioner or Pend Oreille. ↩
7. Of the purchase price $ 15,000 was financed through a loan from First Security Bank. The property was originally purchased for Deanna Hiatt, petitioner's daughter, and she purchased it in 1977 from the corporation for $ 36.000. ↩
8. This property was held as rental property by the corporation through 1978. ↩
9. To acquire the property the corporation assumed the seller's obligation of $ 22,079. ↩
10. Of the purchase price $ 122,825 was financed by the seller. The property was purchased for use as a retail cheese outlet. ↩
11. Other employees of Pend Oreille were paid by check. ↩
12. Deanna Hiatt's home was purchased by the corporation in 1976 and then sold to Deanna in 1977. Richard Beyer's home was purchased by the corporation in 1975 and was later sold to Richard in 1977. In 1975 and 1976 petitioner used corporate funds to repair and complete Richard's house and these amounts were deducted as business expenses on Pend Oreille's corporate returns. See notes 4 and 7 infra. ↩
*. An amended return was filed for 1974 to carryback a net operating loss from the 1975 return and an unused investment credit from the 1976 return. The amended return for 1974 shows a taxable income of $ 2,337 and a tax liability of zero. ↩
13. From the date of its incorporation in 1964 through the year ended on August 31, 1973, Pend Oreille's returns show net losses in each year except for net incomes of $ 8,758.83 in 1967, $ 4,231.95 in 1969, $ 526 in 1970, and $ 4,667 in 1972. ↩
14. The parties subsequently stipulated that petitioner inherited $ 14,444.76 from his mother. ↩
*. To determine petitioner's increase in net worth respondent reconstructed the net worth of Pend Oreille then made adjustments to take into account the effect of the corporation's fiscal year. ↩
15. Petitioner does not question the $ 6,223.74 shown in the summary as additional cash or accounts receivable. ↩
16. Petitioner testified only that in the settlement Mrs. Beyer got the tavern operation while he got the cheese operation. ↩